ITT CONSUMER FINANCIAL COR-
PORATION d/b/a ITT Financial
Services, Appellant,

v.

Daniel TOVAR, Appellee.

No. 08–95–00385–CV.

Court of Appeals of Texas,
El Paso.

June 11, 1996.

Rehearing Overruled Oct. 16, 1996.

---

Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, for appellant.

Steven C. James, El Paso, Mara Asya Blatt, El Paso, for appellee.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

BARAJAS, Chief Justice.

This is an appeal from a judgment on a jury verdict awarding Appellee actual and punitive damages for negligence, gross negligence and intentional infliction of emotional distress. We reverse and render.

## I. SUMMARY OF THE EVIDENCE

Appellee holds a degree in criminal justice and works as a paralegal specialist for the United States Customs Service. In late 1987, Appellee bought a home and invited his best friend from high school, Frank Chavira, who was working at Appellant's consumer loan office as an assistant manager,[1] to share the house. Chavira paid for a room of his own and a half share of the utilities. Appellee, however, had problems getting Chavira to pay his rent and bills in a timely fashion. Therefore, beginning in 1988, Appellee allowed Chavira to deposit checks into his personal bank account. When Chavira needed money, Appellee would either write him a check, withdraw money from an ATM, or give Chavira his ATM card to withdraw a specific amount.

Appellant is engaged in the business of consumer lending nationwide and had several branches in El Paso. Appellant employed approximately a dozen auditors who conducted periodic branch audits pursuant to a pro-

gram encompassing 250 areas of office operation. The El Paso Number One Branch ("the Branch"), where Chavira worked, was audited (the "250–point audit") in December 1987, and it received an above average "C+" rating, meaning that the Branch was running generally within company guidelines.[2] It is undisputed that this auditing program was not designed to detect fraud.

The Branch was not audited again until 1992. According to Appellant's former audit supervisor, a branch receiving a "C" grade would generally be audited again within approximately two years after the previous audit.[3]

In addition to the 250–point audits, Appellant employed regional managers, each responsible for eight to twelve branches, who were required to audit the branches in their region every 120 days by taking a statistical sampling of loans made since the previous 120 day audit. The sample loans were reviewed pursuant to a twenty point check system to determine whether they complied with company policy.

On December 29, 1989, Rose Santana, a Branch employee, discovered irregularities in six accounts. Neither the aforementioned 250–point audit nor the 120 day audit had uncovered these irregularities. This finding launched a lengthy investigation by Regional Manager Ray Chavez and Director of Security and Special Investigations Jim Klein. On January 4, 1990, Chavira confessed to embezzling through eighteen fraudulent accounts. Appellant immediately suspended him without pay and turned him over to the El Paso Police.

It was eventually revealed that Chavira, between May 1987 and January 1990, embezzled $59,178 from Appellant by creating twenty-nine fictitious loans. Chavira created files to make the fictitious loans appear legitimate, then later destroyed the files for twenty-seven of the twenty-nine accounts. Chavira would prepare a loan application and then

---

1. Chavira was promoted to Branch Manager in 1988.

2. However, there were significant deficiencies in compliance with some company policies.

3. Between 1988 and 1992, when the Branch was next audited, Appellant revised its audit system three times in an effort to achieve the optimal geographic area in which to conduct the audits. Thus, it appears the Branch slipped through the auditing cracks.

instruct other branch employees to do the required pre-loan verifications, explaining that the customer would come to the office after hours to close the loans with him. Chavira also made entries into the computer system indicating that a check was received. Thus, employees, believing that a post-dated check had been received, would not follow up with the customer. Beginning in October 1989, Chavira kept control of all post-dated checks received by the Branch, making it more difficult for employees to know what checks had been received. Eventually, he used one month deferments to make the delinquent accounts appear current. Although Appellant allowed customers two deferments a year, some accounts had as many as nineteen deferments.

For the first twelve months of the fraud, Chavira passed the fraudulent checks through his own MBank checking account. Thereafter, Chavira closed his account and began using Appellee's El Paso Teacher's Credit Union checking account to clear the checks and obtain the cash proceeds. Chavira eventually deposited seventeen embezzled checks totaling $34,523.66 into Appellee's account. Although Appellee had two accounts with Appellant, neither account was affected by Chavira's embezzling and money laundering schemes. Regarding the money deposited into Appellee's account and the fact that he was unaware of the deposits, Appellee testified as follows:

Q. Did they (Chavez and Klein) ask you if you were balancing—or how you balanced your checking account?

A. Yes, sir, they did.

Q. And what did you tell them about that?

A. I told them that I do receive statements and that I do look at them. However, my main method of balancing my checkbook was to call the bank and they give you the information, if you want the last five checks, or the last three checks, the last deposits, and I would—I personally preferred doing it that way.

4. That evening, Appellee told Chavira about his meeting with Klein. Chavira told him that Appellant was probably doing an audit or investigation, but said that Appellee should "look into it

On March 27, 1990, Jim Klein and Appellee had a telephone conversation regarding the seventeen embezzled checks deposited into his account. Klein explained that each of the checks bore a first endorsement in the customer's name and a second endorsement in the name of Appellee. Appellee declared that he had no knowledge of the checks.

The following day, Appellee went to Appellant's offices to examine the checks. Klein asked Appellee if he knew Chavira, but at no time informed him about the underlying fraudulent loans. Appellee examined twelve of the embezzled checks and confirmed his account number which appeared on each of the checks below the endorsement in Appellee's name. Appellee again denied knowledge of the checks and stated that the endorsements in his name were forgeries. Appellee stated that he did not have any roommates who might have access to his account without his knowledge.[4]

Chavira was arrested on December 29, 1991. Appellee bailed him out of jail the next day and took him to see an attorney. At this point, Appellee was informed about the fraud and the money being laundered through his account.

On May 15, 1990, Chavez and Klein gave the El Paso Police Department their investigative report entitled "Statement Regarding Embezzlement." This report provided, in pertinent part to Appellee:

### PURPOSE OF THIS STATEMENT

This statement provides information relating to the admitted embezzlement of over $20,000 by an ITT Financial Services employee, Frank Chavira.

ITT Financial Services requests the information presented herein be reviewed and further investigated by law enforcement officials for the purpose of filing criminal charges, on Frank Chavira and other co-conspirators, as appropriate.

\* \* \* \* \* \*

because if somebody is trying to use your name or account number, you better get to the bottom of it."

### DISPOSITION OF DIVERTED CHECKS

\* \* \* \* \* \*

Seventeen (17) checks, totaling $34,523.66, appear to have been deposited to account # 38179 at the El Paso Teachers Credit Union. All the checks have a (fraudulent) first endorsement in the alleged customer's name followed by a second endorsement in the name of Daniel Tovar and account # 38179.

J.M. Klein and I interviewed Daniel Tovar on March 28, 1990, at the El Paso # 1 branch office (Exhibit 6). Tovar confirmed that account # 38179 was his account, however he denied having any knowledge of the ITT checks being deposited to the account. Tovar examined the purported endorsements in his name and stated that they were forgeries. Tovar said that no one else had authority to sign on his account. Tovar acted as if someone must be using his account without his knowledge. Tovar said he probably did not detect the activity in the account because he never looked at his monthly account statement. Tovar refused to provide a written affidavit concerning the forgeries. Exhibits 6 and 7 are notes of J.M. Klein's telephone conversations with Tovar on March 28, 1990 and March 29, 1990.

\* \* \* \* \* \*

Delacruz (whose name Chavira used on a fraudulent account) said that he also knows Daniel Tovar and that Chavira and Tovar are also friends.

Several ITT Financial Services branch employees stated that Chavira received many calls from a "Danny." Chavira told employees that Danny was his brother. (This has not been confirmed).

ITTFS employee Francis Trejo recalls that in January or February, 1990, Daniel Tovar came into the branch and made a payment on his account. While he was in the office, Tovar asked about what happened to Chavira. Tovar said that Chavira told him that he left ITTFS because he was being forced to transfer.

### CONCLUSION

The evidence presented above supports that Frank Chavira knowingly and willfully engaged in fraudulent deceptive acts designed to embezzle monies from his employer, ITT Financial Services. Chavira's actions, supported by his admissions, indicate that he acted intentionally, fully understanding the outcome of his acts and knowing that he had no legal basis for engaging in these fraudulent activities. His deceptive actions were accomplished without the effective knowledge or consent of ITT Financial Services.

The case was assigned to Dempsey Gunaca, Chief Investigator of the District Attorney's White Collar Crime Unit. Gunaca subpoenaed bank records in an effort to determine the disposition of the embezzled funds. He also hired a handwriting expert to determine whether the endorsements in Tovar's name were forgeries. Regarding the prosecution of Appellee, Gunaca testified as follows:

Q. Who made the decision to indict Daniel Tovar?

A. I made that—to indict him? The grand jury did. To present it to the grand jury, I did.

Q. Okay.

A. I—when I got the records from the bank and I reviewed all the documents, it was strange to me that Mr. Tovar wasn't included in the initial presentation of the case by the police department. Of course, I realized that the police department had no way of knowing Tovar's involvement because they didn't have grand jury subpoena power, but they—they could have gotten more information from us.

But this particular detective that handled this case simply retrieved the evidence from ITT Financial and wrote up a summary, which this is a copy of, and presented it to our office for further investigation. They didn't do it, but when I reviewed all the records, it was obvious to me that there was no way that all this money could have gone through this account without the cooperation of the individual that owned the account, which was Mr. Tovar.

I—At that time when I completed the review, I called ITT Financial, and I believe I talked to Mr. Klein, if I'm not mistaken, and I asked Mr. Klein if he had ever, or anybody in his organization, had ever contacted this man, Tovar, that owned the account that all the money was going into. He said yes, that they had spoken to him.

And I said, 'Well, why—why didn't you include him in your—in your charges that you filed?' And he said, 'Well, Mr. Tovar declared emphatically that he knew nothing about Mr. Chavira using his account.' And I said, 'Well, you know, I find that hard—hard—hard to understand or believe.' He said, 'Well, we had, you know, nothing to base charging him with anything on.'

Q. Now, this was your first conversation with Mr. Klein?

A. Right. And I had told him that—

Q. I mean, excuse me, you called him?

A. Yes, sir, I called him, and I told him, I said, well, from where I was sitting and the information I was looking at, Mr. Tovar was definitely a part of this conspiracy, and was there any reason in his mind why Mr. Tovar should not be involved as far as the charges were concerned. And he said, 'Well, that's completely up to you guys.' And I said, 'Well, we're going to include him as a participant, you know, in these charges.'

Q. Did anyone from ITT at any time during the course of this investigation, for the lack of a better term, influence the district attorney's office in obtaining an indictment against Daniel Tovar?

A. Oh, no, no. As a matter of fact, they didn't even try to influence me in doing anything more about Chavira. They just presented the case and they only responded if I called them and asked a question.

\* \* \* \* \* \*

Q. Well, let me ask you just outright here. Do you recall seeing the document in which Mr. Ray Chavez of ITT and Mr. Jim Klein discussed Frank Chavira's accomplice in this matter?

A. I truthfully cannot recall all of the evidence that I reviewed in that case because again, I was working on several cases.

\* \* \* \* \* \*

Q. And what you drew conclusions from, and what you didn't draw conclusions from?

A. Exactly. I know that I drew conclusions about Mr. Tovar from the evidence I got under grand jury subpoena. I also know that ITT Financial verbally, and maybe in writing, indicated that Mr. Tovar declared he knew nothing about Mr. Chavira using his bank account.

Appellee was indicted by a grand jury in July of 1991. He was arrested at his office on December 31, 1991. As a result, the Customs Service conducted a three year internal affairs investigation of him. Appellee was tried and found innocent by a directed verdict on February 12, 1992.

After his arrest, Appellee began exhibiting emotional and physical symptoms of extreme stress. After the trial, Appellee saw a clinical social worker, a psychologist and a psychiatrist. He was diagnosed as suffering from major depression and post-traumatic stress disorder. Thereafter, he was hospitalized as an outpatient for psychiatric treatment for two months at Sun Valley Behavioral Health Center.

On August 4, 1992, Appellee filed this action against Appellant alleging malicious prosecution, defamation, intentional infliction of emotional distress, negligence and gross negligence. At the close of Appellee's case-in-chief, the trial court directed a verdict in favor of Appellant on Appellee's malicious prosecution and defamation claims. The trial judge, who also heard Appellee's criminal case, ruled as follows on Appellant's motion for directed verdict:

With regards (sic) to the motion for directed verdict on the malicious prosecution claim, the Court finds that the Defendant ITT did not initiate the case against Mr. Tovar, but rather, that was left to the discretion of the district attorney's office, and rather, it was the district attorney's

office who initiated and procured the prosecution against Mr. Tovar.

And let me further add that I find the district attorney's supervision of its assistants negligent and grossly negligent in that had there been some thought applied and some knowledge of the law applied to the review of that case, and had there been some temperance on the part of the district attorney—assistant district attorney handling the case when it was ready to go to trial, that prosecution would have been dismissed. And that the Court actually instructed the assistant district attorney handling that case to review the case because the Court felt that they would not be able to make the charges or present the evidence sufficient to establish a case against Mr. Tovar. And perhaps the district attorney's office should have been a defendant in this case.

The Court finds that there was probable cause for the acts that ITT took in its presentation of the case to the district attorney's office and that they were not actually initiating or procuring a complaint against Mr. Tovar, but simply presented the facts as they knew them. And I further find that there was no malice in the actions of the Defendant ITT in presenting the case to the district attorney's office. So the motion for directed verdict as to that cause of action is granted to the Defendant.

The negligence, gross negligence, and intentional infliction of emotional distress claims were submitted to the jury. The jury re-

turned a verdict awarding Appellee $1,204,-750 in actual damages and $1,500,000 in punitive damages,[5] which precipitated this appeal.

## II. DISCUSSION

Appellant attacks the judgment of the trial court in four points of error. In its second point of error, Appellant avers that the evidence was legally and factually insufficient to support the jury's finding that Appellant was negligent. Appellant contends that it owed no duty to Appellee as a matter of law. We begin with the standards we employ.

In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Texas Tech Univ. Health Sciences Ctr. v. Apodaca*, 876 S.W.2d 402, 411–12 (Tex.App.—El Paso 1994, writ denied). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex. App.—El Paso 1994, writ denied); *Hallmark v. Hand*, 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).[6]

The common law doctrine of negligence consists of three essential elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987).

---

**5.** The actual damages questions were answered as follows:

*Question No. 3*

What sum of money, if paid now in cash, would fairly and reasonably compensate Daniel Tovar for his damages, if any, that were proximately caused by the negligence you have found?

$*$ $*$ $*$ $*$ $*$ $*$

ANSWER:

a. Medical expenses of Daniel Tovar; $ 7000.00

b. Lost income of Daniel Tovar; $ 14,000.00

c. Legal fees related to the defense of the criminal charges brought against Daniel Tovar; $ 6220.00

d. Cost of the bail bond; $ 2530.00

e. Damage to the reputation of Daniel Tovar; $250,000.00

f. Daniel Tovar's mental anguish; and $400,000.00

g. Daniel Tovar's physical pain and suffering. $ 25,000.00

*Question No. 6*

What sum of money, if paid now in cash, would fairly and reasonably compensate Daniel Tovar for his damages, if any, that were proximately caused by the intentional infliction of emotional distress you have found?

$*$ $*$ $*$ $*$ $*$ $*$

a. Daniel Tovar's emotional distress.
ANSWER: $ 500,000.00

**6.** As we render on all points, we do not employ the factual sufficiency standard.

The threshold inquiry in a negligence case is duty; a plaintiff must prove both the existence and the violation of a duty owed to him by the defendant to establish liability in tort. *El Chico*, 732 S.W.2d at 311. The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 312 (Tex.1983). In determining whether the defendant was under a duty, we consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See id.* at 309.

We begin by discussing the various social utility factors in determining whether Appellant owed a duty to Appellee. A sufficiently analogous issue was addressed in *Wal–Mart Stores, Inc. v. Medina*, 814 S.W.2d 71 (Tex. App.—Corpus Christi 1991, writ denied). In *Medina*, Medina filed suit against Wal–Mart and Kent Sweet, Wal–Mart's District Loss Prevention Supervisor, seeking recovery for damages resulting from an investigation of Medina conducted by Sweet on allegations of theft. The jury found for Wal–Mart on the malicious prosecution claim and against it on negligence and gross negligence claims.

The salient facts of *Medina* are as follows: Medina worked at Wal–Mart's Aransas Pass store. During her employment, a fellow employee implicated her in a series of thefts involving an under-ringing scheme. Under this alleged scheme, an employee-cashier would deliberately undercharge an employee-customer for purchases the employee-customer made. Sweet conducted an investigation and took statements from three employees who were working the day of the alleged theft.

Sweet provided the District Attorney for Aransas County with the results of his investigation. He signed an affidavit implicating Medina and two others in the thefts. Arrest warrants were sworn out against all three and theft charges were filed against them. After further investigation, however, the District Attorney's office dropped all charges against Medina.

Medina brought suit against Wal–Mart to recover for malicious prosecution and negligence in connection with Wal–Mart's institution of the theft prosecution. The charge included the following question: "Do you find from a preponderance of the evidence that the prosecution of Plaintiff, Esther Medina, for the offense of theft was instituted maliciously and without probable cause?" The jury responded negatively to this question. The jury did find, however, that Wal–Mart was negligent and grossly negligent. It awarded $20,000 in compensatory damages and $5,000 in punitive damages. In addition, it awarded $1,050 to compensate Medina for the attorney's fees she incurred defending the criminal charge.

On appeal, Wal–Mart contended that its conduct in investigating Medina should be measured by the standards applied in the tort of malicious prosecution, and not negligence. Wal–Mart further asserted that negligence is not a cause of action upon which Medina may recover since it owed no duty of care to Medina under traditional theories of negligence independent of that set forth in the tort of malicious prosecution. The court of appeals agreed, finding that "appellee failed to prove a negligence case against Wal–Mart":

> The gist of Medina's case was clearly to seek recovery for injuries caused by the prosecution. The evidence showed that Medina's damages were caused by Wal–Mart's disclosure of this information to the police, and the subsequent prosecution. She even sought recovery for the attorney's fees expended in her defense. These damages clearly fall within the scope of the tort of malicious prosecution. In light of the public policy considerations and the law of malicious prosecution as described earlier, it would be improper for us to apply principles of negligence here.

*Medina*, 814 S.W.2d at 74, 74 n. 5.

In the instant case, as with *Medina*, Appellee brought suit to recover for injuries caused by his prosecution. Indeed, were there no prosecution of Appellee, we would not be hearing this appeal. We hold that a plaintiff cannot avoid the strict elements of a

malicious prosecution action by labeling it negligence. *See Medina*, 814 S.W.2d at 73–74 (asserting that "there is no recovery in tort for damage caused by an incorrect, but not malicious prosecution"); *see also Pokorny v. First Fed. Savs. & Loan Ass'n of Largo*, 382 So.2d 678, 683 (Fla.1980) ("Florida courts have never recognized a separate tort for "negligently" swearing out a warrant for arrest. Such cases may be brought only in the form of civil suits for malicious prosecution. A plaintiff contending that he had been improperly arrested as the result of negligence in swearing out a warrant must bear the burden of establishing malice and want of probable cause. Mere negligence alone is insufficient.") (citations omitted); *Lundberg v. Scoggins*, 335 N.W.2d 235, 236 (Minn.1983) ("The public policy limiting malicious prosecution actions applies with especial force to actions which would make witnesses or victims liable for their negligence in assisting criminal investigations or prosecutions. Persons having knowledge of crimes, as a fundamental duty of citizenship, are encouraged, if not obligated, to report and assist in investigation and prosecution of these crimes.... A threat of an action—which does not include an element of maliciousness—would serve to further discourage citizen participation in criminal investigations and prosecutions."); *McGranahan v. Dahar*, 119 N.H. 758, 408 A.2d 121, 128 (1979) ("The law does not, and should not, allow recovery in tort by all persons accused of crimes and not convicted. There is no guarantee in our society that only guilty persons will be accused and arrested. Except in extreme cases, for which malicious prosecution or abuse of process are adequate remedies, a person wrongfully accused of a crime must bear that risk, lest those who suspect wrongful activity be intimidated from speaking about it to the proper authorities for fear of becoming embroiled themselves in the hazards of interminable litigation.") (citations omitted); *cf. Reeves v. Westinghouse Elec. Corp.*, 683 F.Supp. 521, 525 (D.Md.1988) ("The tort of false arrest is predicated upon *knowing* misconduct. Negligence or other mistake in providing incorrect information to lawful authorities does not give rise to liability.") (citations omitted).

Several factors persuade us in our determination. First, we note the traditional reason why malicious prosecution actions are disfavored by the law: public policy requires that there be wide latitude in reporting facts to prosecuting authorities in order that the exposure of crime not be discouraged. Such argument is equally applicable to a cause of action for negligence in allowing someone to be prosecuted. Why would Appellant, or any business with a clear conscience, report the theft of a relatively small amount of money by its employee when it could be faced with a negligence suit by an unknown third party implicated by the thieving employee?[7] Indeed, anytime someone embezzles money from a corporation, it could be stated that the corporation was at least a little negligent.

We also see little benefit in allowing a negligence action in lieu of a malicious prosecution cause of action. Certainly financial institutions have auditing procedures to detect theft by their employees. Such controls are used to protect the investment by the owners of the company, not to protect against negligence actions by unknown third parties. Although Appellee put on extensive evidence that Appellant's auditors should have detected the embezzlement, we find this fact unpersuasive. Financial institutions engage in auditing up to the point where it no longer becomes cost-effective to audit; that is, where the marginal cost of one dollar of auditing controls no longer saves one dollar of theft or wasted resources (the marginal benefit). Accordingly, we find that social policy factors militate against recovery in tort for damage caused by an incorrect, but not malicious, prosecution.

 We now turn to foreseeability. Foreseeability of the risk is "the foremost and dominant consideration" in determining whether the defendant was under a duty. *El Chico*, 732 S.W.2d at 311. "In the absence of foreseeability, there is no duty." *Nations-*

---

7. In the *Medina* case, Wal–Mart would refuse to report employee theft, consisting largely of sundries, if it were subject to numerous negligence claims. Instead, it would make economic sense for the employer to simply terminate the employee.

*Bank, N.A. v. Dilling,* 922 S.W.2d 950, 954 (Tex.1996).

■ The parameters of the concept of duty are found in the seminal case of *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928), wherein Chief Justice Cardozo observed that "[t]he risk reasonably to be perceived defines the duty to be obeyed...."[8] Thus, the central question becomes whether the injury to Appellee might reasonably have been anticipated, and whether Appellee was "so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Haight v. Savoy Apartments,* 814 S.W.2d 849, 853 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

In *Dilling,* 922 S.W.2d at 951–52, the Supreme Court determined whether (1) a financial institution is vicariously liable for the fraudulent acts of a bank teller whose participation in an investment scheme caused damages to a third party, and (2) the financial institution is directly liable to the third party for negligently employing the teller, who improperly issued cashier's checks that the bank honored.

An understanding of *Dilling* requires a detailed summation of the facts. Fritz McMillon formed McMillon Enterprises, Ltd. (MEL), a business allegedly organized to buy and sell rental cars. Carolyn Price, a NationsBank teller who had previous criminal convictions for theft and welfare fraud, was also involved in MEL's operations. McMillon offered Harry Dilling an opportunity to invest in MEL. Unbeknownst to Dilling, McMillon, Price, and others had devised a scheme to defraud him. Although Dilling was aware that McMillon had served time in federal prison for bank fraud, he nevertheless made an initial investment in MEL.

In furtherance of the scheme to defraud Dilling, Price took a number of actions that NationsBank did not authorize. Price accepted an MEL check from McMillon against which she issued several cashier's checks in amounts exceeding the value of the MEL check. She fabricated deposit slips reflecting amounts deposited in MEL's account. Although NationsBank's internal policy required employees to obtain supervisory approval before issuing cashier's checks in amounts greater than $2,500, she did not seek approval.

McMillon presented Dilling the NationsBank deposit slips as evidence that MEL was a legitimate company. McMillon repaid Dilling's initial investment plus a return on that investment with the cashier's checks issued by NationsBank. Satisfied by his "profit," Dilling made several larger investments in MEL, finally investing $595,000 which was never repaid. Dilling was not a NationsBank customer and never met with Price or any other NationsBank representative. Dilling eventually realized that he had been deceived and filed suit against McMillon, Price, and MEL for fraud and conspiracy, and against NationsBank for fraud, conspiracy, and negligence. The trial court rendered judgment against Price, McMillon, and MEL, but rendered a take-nothing summary judgment in favor of NationsBank. Dilling appealed the judgment for NationsBank, contending that (1) NationsBank was vicariously liable for Price's fraudulent acts under an agency theory based on apparent authority and (2) NationsBank was liable for negligently employing Price as a teller because she had prior criminal convictions. The court of appeals reversed the trial court's judgment and remanded those issues for disposition.

After determining that vicarious liability does not attach to an employer in the absence of evidence that its employee was act-

---

8. Texas, like many states, has meandered between the Cardozo foreseeability test and the test enunciated by Judge Andrews in his eloquent *Palsgraf* dissent. *See Palsgraf,* 162 N.E. at 103 (Andrews, J., dissenting) ("Every one owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others."). Quite simply, this is because duties expand, contract and mutate in response to societal changes. *See* William W. Kilgarlin & San-

dra Sterba–Boatwright, *The Recent Evolution of Duty in Texas,* 28 S.Tex.L.J. 241, 245 (1987) ("[D]uty must change with modifications in societal mores and attitudes. It must adapt to technological and economic modifications in our operating procedures and expectations.... [D]uty must not expand so rapidly or fiercely as to hamstring the path of progress and the development of new processes and enterprises.").

ing within the scope of her actual or apparent authority, the Supreme Court turned to Dilling's negligent hiring claim. In finding that NationsBank did not owe Dilling a duty, the court reasoned as follows:

> The fact that it may have been foreseeable that a negligently employed teller would improperly issue checks does not make it foreseeable that a third party who never came into direct contact with the teller would rely on the issuance of cashier's checks to make investment decisions. We therefore hold that NationsBank established as a matter of law that it owed no duty to Dilling.

*Id.* at 954.

In the instant case, it is certainly foreseeable that employees such as Chavira will steal from their employers. It is also foreseeable that any theft or embezzlement by Chavira could harm Appellant's customers, whose accounts and credit would be adversely affected. However, these facts do not make it foreseeable that:(1) Chavira would deposit the stolen funds in the bank account of Appellee, a third party with whom he had no legal relationship and over whom he exercised no control, (2) Appellee, the sole signatory on the account, would have no knowledge of nearly $35,000 of stolen funds in his checking account, and (3) although Appellant did not actively seek the prosecution of Appellee, the district attorney would nevertheless prosecute him. The record reveals that Appellant has had employee theft problems before this incident; however, nothing in the record indicates injury to a non-customer third party. Given the facts of this case, we cannot conclude that the risk of harm (injury) to others such as Appellee was foreseeable. Accordingly, having found as a matter of law that Appellant owed no duty to Appellee, we sustain Appellant's Point of Error No. One.

In its third point of error, Appellant attacks the jury award finding it liable for intentional infliction of emotional distress. Appellant alleges that the evidence is factually and legally insufficient to establish (1) that Chavira acted in the course and scope of his employment, and (2) that Appellant engaged in extreme and outrageous conduct.

Texas has adopted the elements of the tort of intentional infliction of emotional distress as expressed in the RESTATEMENT (SECOND) OF TORTS § 46 (1965). *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993). These elements are: (1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the emotional distress suffered by the plaintiff was severe. RESTATEMENT (SECOND) OF TORTS § 46 (1965). According to the Restatement, liability for outrageous conduct should be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* cmt. d; *see Twyman*, 855 S.W.2d at 621.

Under the scope of employment test, the test of the master's liability is whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do. *Saenz v. Family Sec. Ins. Co. of Am.*, 786 S.W.2d 110, 111 (Tex.App.—San Antonio 1990, no writ); *Rosales v. American Buslines, Inc.*, 598 S.W.2d 706, 708 (Tex.Civ. App.—El Paso 1980, writ ref'd n.r.e.). If a servant deviates from the performance of his duties for his own purposes, then the master is not responsible for what occurs during that deviation. *Viking v. Circle K Convenience Stores*, 742 S.W.2d 732, 734 (Tex.App.— Houston [1st Dist.] 1987, writ denied). "To hold the master liable, the act of the servant must be done in the furtherance of the master's business, and for the accomplishment of the object for which the servant is employed." *Saenz*, 786 S.W.2d at 111; *see Kendall v. Whataburger, Inc.*, 759 S.W.2d 751 (Tex.App.—Houston [1st Dist.] 1988, no writ).

In the instant case, Chavira was employed as a branch manager for Appellant. He was authorized to make loans up to $2,500, sign loan checks, submit loan modifications, defer late payments, handle customer complaints, select personnel, institute collection procedures, and conduct loan closings. These

were his authorized duties. When Chavira devised a scheme to embezzle money from Appellant by creating fictitious loans, he was not acting in the furtherance of Appellant's business. "It is inconceivable that an employee could plan and execute a fraud upon his employer and be in the furtherance of his employment." *Saenz*, 786 S.W.2d at 111. Accordingly, we find that Chavira was not acting in the scope of his employment when he created the fictitious loans and placed the proceeds in Appellee's account.

 Appellee urges that the conduct of Chavez and Klein was extreme and outrageous. Appellee's theory appears to be, as with his other theories, that Appellant "negligently", carelessly, or lackadaisically reported information to the district attorney:

> The best response Tovar can make to this point at this time is that the evidence adduced at trial demonstrated that ITT, through Chavez and Klein, intentionally misrepresented and withheld information to the DA concerning Tovar's involvement, despite the fact that they emphatically believed that Tovar was innocent of any involvement in Chavira's scheme. Both Klein and Chavez continued to talk with the DA and urged the prosecution to go forward. Klein, apparently under pressure to see some results, expressed great frustration to his superiors concerning the lack of haste with which the DA was proceeding. The jury could have reasonably concluded that Tovar was his, and ITT's, best hope for recovering some money.

> Klein left ADA Meraz with the impression he did not believe Tovar's story. Klein also told ADA McDonald, after Tovar was indicted, that Klein thought Tovar was an accomplice. His actions, when examined in the context in which they occurred, are factually sufficient evidence that Klein went beyond "all possible bounds of decency" and ensured that Tovar would be tried.

We find nothing extreme or outrageous in the conduct of Klein or Chavez. Indeed, seventeen fraudulent checks totaling almost $35,000 going through an account would make anyone, even Appellee, suspicious:

Q. You work with the Government in the Customs agency, criminal justice major at UTEP. You could understand why an investigator would be a little curious about checks going through somebody's account, wouldn't you, under these circumstances? In other words, somebody signing, forging checks, signing someone else's endorsement, and running it through an account that isn't theirs?

A. Yes, sir.

Q. So it's not without the realm of possibility that these people were just investigating, trying to get to the bottom of this?

A. Yes, sir.

Accordingly, finding that Chavira was not acting in the scope of his employment and that the conduct of Chavez and Klein was not so outrageous and extreme in degree as to "go beyond all bounds of decency", we find that the evidence is legally insufficient to support a finding of severe emotional distress and sustain Appellant's Point of Error No. Three.

 By cross-point, Appellee contends that the trial court erred in granting Appellant's motion for directed verdict as to Appellee's malicious prosecution cause of action. We disagree.

 A directed verdict is proper: (1) when a defect in the opponent's pleadings makes them insufficient to support a judgment; (2) when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) when the evidence offered on a cause of action is insufficient to raise an issue of fact. *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 932 (Tex.App.—San Antonio 1989, writ denied); *McCarley v. Hopkins*, 687 S.W.2d 510, 512 (Tex.App.—Houston [1st Dist.] 1985, no writ).

 In reviewing the granting of a directed verdict by the trial court on an evidentiary basis, we "determine whether there is any evidence of probative force to raise fact issues on the material questions presented." *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). We consider all of the evidence in a light most favorable to the party against whom the verdict was instruct-

ed and disregard all contrary evidence and inferences arising therefrom. *White v. Southwestern Bell Telephone Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983); *Anderson v. Vinson Exploration, Inc.,* 832 S.W.2d 657, 661 (Tex.App.—El Paso 1992, writ denied). If there is any conflicting evidence of probative force on any theory of recovery, the issue is for the jury; an instructed verdict is improper and the case must be reversed and remanded for the jury's determination on that issue. *White,* 651 S.W.2d at 262; *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora,* 574 S.W.2d at 68. Where no evidence of probative force on an ultimate fact element exists or where the probative force of the testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *Anderson,* 832 S.W.2d at 661; *University Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 709–10 (Tex.App.—San Antonio 1989, no writ).

■■■ The plaintiff in a malicious prosecution case has the burden of proving five essential elements: (1) commencement of a criminal prosecution, (2) with malice, (3) without probable cause, (4) the prosecution ended in an acquittal, and (5) damages. *Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied); *see Dominguez v. Kelly,* 786 S.W.2d 749, 751 (Tex.App.—El Paso 1990, writ denied). Actions for malicious prosecution are not favored in the law. *Diamond Shamrock Corp. v. Ortiz,* 753 S.W.2d 238, 241 (Tex.App.—Corpus Christi 1988, writ denied); *Parker v. Dallas Hunting and Fishing Club,* 463 S.W.2d 496, 499 (Tex.Civ.App.—Dallas 1971, no writ); *Montgomery Ward & Co. v. Kirkland,* 225 S.W.2d 906, 909 (Tex.Civ.App.—San Antonio 1949, writ ref'd n.r.e.). Public policy discourages the bringing of such actions, and the proof must be positive, clear and satisfactory. *Kirkland,* 225 S.W.2d at 909.

■■■ However, the tort of malicious prosecution serves an extremely important purpose. It exists between the tension of two important societal interests—encouraging the reporting of crimes and discouraging wrongful or unjustifiable prosecution. As was stated by our Supreme Court over a century ago:

> It is important that every citizen should be protected against malicious prosecutions, and it is equally important that crimes should be punished, in order that the law-abiding citizen may be secure in life, liberty, and property. To make the citizen liable to be mulcted in damages for an honest discharge of duty is to give immunity to crime, and to weaken the restraining power of the criminal law, thereby endangering the security of law-abiding people.

*Sebastian v. Cheney,* 86 Tex. 497, 25 S.W. 691, 694 (1894).

■■■ In the instant case, giving Appellee the benefit of every doubt and indulging every legitimate inference in his favor, we find no evidence of malice in the record. As indicated in the "Statement Regarding Embezzlement", *supra,* Appellant simply reported the known facts of the fraud to the proper authorities. Appellee's argument appears to be based on the omissions or negligence of Appellant:

> In the Statement which Chavez and Klein law (sic) prepared, law enforcement officials were never explicitly told the (sic) Chavez and Klein did not believe Tovar was a co-conspirator of (Chavira). Chavez also believed that other ITT employees were implicated in Chavira's scheme, yet failed to tell the police or the DA of his suspicions. Because the Statement also explicitly exculpated other ITT employees, Tovar was left as the only other person referred to in the Statement who might have been involved in Chavira's scheme. The failure to disclose to the authorities all exculpatory evidence favoring Tovar becomes critical because ITT requested that prosecutions be brought against Chavira and **all co-conspirators.** (Emphasis added).

Even taking such assertions as true, which we do not, nothing indicates malice, ill will or "sinister motive" on the part of Appellant.[9]

---

**9.** Texas does not recognize the tort of negligent prosecution. *See Campbell v. City of San Anto-*

Accordingly, we overrule Appellee's Cross-point of Error No. One.

Having sustained Appellant's Points of Error Nos. One and Three, and having overruled Appellee's Cross–Point of Error No. One, we render a take-nothing judgment.

*nio,* 43 F.3d 973, 981 (5th Cir.1995) ("To hold, as Campbell would have us do, that Vidal's negligent misidentification of her is actionable would in substance convert the Texas tort of *malicious* prosecution to one of *negligent* prosecution. This we decline to do.") (footnote omitted).