In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-399 CV


____________________



CYPRESS CREEK EMERGENCY MEDICAL SERVICES, INC., Appellant



V.



STEVEN COSBY and KRISTEN LEE COSBY, Individually and


a/n/f of BRENDYN COSBY and PEYTON COSBY, Appellees






On Appeal from the 359th District Court


Montgomery County, Texas


Trial Cause No. 04-11-09161-CV






MEMORANDUM OPINION


 Cypress Creek Emergency Medical Services, Inc. ("Cypress Creek") perfected this
interlocutory appeal following the trial court's denial of its plea to the jurisdiction. See Tex.
Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (Vernon Supp. 2006). Plaintiffs Steven Cosby
and his wife Kristen, acting individually and as next friends of Brendyn Cosby and Peyton
Cosby (collectively "Cosbys"), sued Cypress Creek and three other defendants (1) for personal
injuries sustained by Steven Cosby, an invited guest, during the course of a party at the home
of co-defendant Eugene H. Williams, Jr. Apparently as a practical joke, Williams detonated
an explosive device, referred to as a "noise flash diversionary device" ("NFDD"), in close
proximity to where Steven Cosby was standing, resulting in severe injury to Cosby's right
foot and ultimately necessitating its amputation. At the time of the incident, Williams was
special operations coordinator for Cypress Creek which involved, inter alia, conducting
certain training exercises for various EMS personnel during which NFDD's were used. As
a former employee of the Bureau of Alcohol, Tobacco, Firearms, and Explosives in his
position as special operations coordinator, Williams was entrusted with Cypress Creek's
supply of NFDD's, and was one of two Cypress Creek employees who purchased NFDD's. 
 After the Cosbys filed their fifth amended original petition, Cypress Creek filed its
plea to the jurisdiction asserting it was a governmental unit as defined under sections
101.001(1) and 101.001(3)(c) of the Civil Practice and Remedies Code. See Tex. Civ. Prac.
& Rem. Code Ann. § 101.001(1), 3(c) (Vernon 2005); see generally Tex. Civ. Prac. & Rem.
Code Ann. §§101.001 - .109 (Vernon 2005 & Supp. 2006) ("Texas Tort Claims Act" or "the
Act"). As a governmental unit subject to the provisions of the Act, Cypress Creek argued
that it was immune from suit as Williams, although an employee of Cypress Creek, was not
acting within the course and scope of his employment with Cypress Creek when he detonated
the explosive device that injured Steven Cosby. See id. § 101.021(1) (governmental unit is
liable for personal injury caused by wrongful act or omission or negligence of an employee
"acting within his scope of employment . . ."). The Cosbys filed a lengthy response in
opposition to the plea to the jurisdiction arguing that Cypress Creek is not a governmental
unit as it does not meet the statutory definition of "emergency service organization" under
section 101.001(1) of the Act. See Tex. Civ. Prac. & Rem. Code § 101.001(1). Cypress
Creek filed a reply to the Cosbys' response, with the Cosbys responding in opposition to
Cypress Creek's reply. The trial court denied the plea to the jurisdiction. Cypress Creek's
two appellate issues require us to determine whether it is a "governmental unit" for purposes
of the Texas Tort Claims Act, and, if so, whether the Act provides a waiver of immunity
under the facts and circumstances presented. 

 Sovereign immunity from suit defeats a trial court's subject matter jurisdiction unless
the state expressly consents to suit. Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex.
1999). Sovereign immunity has two components: immunity from liability and immunity
from suit. Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 696 (Tex. 2003). Section
101.021 of the Texas Tort Claims Act waives the State's immunity from liability under
certain circumstances. See Tex. Civ. Prac. & Rem. Code § 101.021. The Act also waives
the State's immunity from suit to the extent of liability created by the Act. See id. § 101.025. 
A trial court's subject matter jurisdiction is a question of law and subject to de novo review. 
Tex. Nat. Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002). Whether
a plaintiff has alleged sufficient facts to affirmatively demonstrate a trial court's subject
matter jurisdiction is also a question of law that we review de novo. See Tex. Dep't of Parks
& Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004). In resolving the jurisdictional
issue raised, we are permitted to examine the plaintiff's pleadings as well as any evidence
relevant to said issue submitted by the parties. See Tex. Nat. Res. Conservation Comm'n v.
White, 46 S.W.3d 864, 868 (Tex. 2001); Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555
(Tex. 2000).

I. IS CYPRESS CREEK A "GOVERNMENTAL UNIT?" 


 The record indicates the Cosbys' pleadings allege Cypress Creek lost its protection
from liability under the Texas Tort Claims Act because it was no longer exclusively engaged
in providing medical services, but was also "perform[ing] law enforcement duties in addition
to emergency medical services[.]" Further illumination of this position is contained in the
Cosbys' initial response in opposition to the plea to the jurisdiction. The Cosbys argue that
for Cypress Creek to invoke the protection provided by the Act, it must meet the definition
of "governmental unit." Among the entities defined by the Act as a "governmental unit" is
an "emergency service organization." See Tex. Civ. Prac. & Rem. Code Ann. §
101.001(3)(C). This section further defines an "emergency service organization" in the
following manner:

 (1) "Emergency service organization" means a volunteer fire department,
rescue squad, or an emergency medical services provider that is:

 (A) operated by its members; and 

 (B) exempt from state taxes by being listed as an exempt organization
under Section 151.310 or 171.083, Tax Code.


See id. § 101.001(1)(A),(B). Titled "Religious, Educational, and Public Service
Organizations," section 151.310 of the Texas Tax Code includes, for our purposes, the
following pertinent provision:

 (a) A taxable item sold, leased, or rented to, or stored, used, or consumed by,
and of the following organizations is exempted from the taxes imposed by this
chapter:


 . . . .


 (2) an organization qualifying for an exemption from federal income
taxes under Section 501(c)(3), (4), (8), (10), or (19), Internal Revenue Code, 
. . . 


Tex. Tax Code Ann. § 151.310(a)(2) (Vernon 2002). Titled "Exemption - - Emergency
Medical Service Corporation," section 171.083 states: "A nonprofit corporation that is
organized for the sole purpose of and engages exclusively in providing emergency medical
services, including rescue and ambulance services, is exempted from the franchise tax." 
Tex. Tax Code Ann. § 171.083 (Vernon 2002). 

 The Cosbys do not dispute the fact that Cypress Creek was incorporated in 1975, and
received its tax-exempt status under section 501(c)(3) of the Internal Revenue Code from the
Internal Revenue Service that same year. Attached to the plea to the jurisdiction is a letter
dated May 18, 2006, from the Internal Revenue Service confirming Cypress Creek's
continued tax-exempt status since the determination letter was issued in July 1975. However,
the Cosbys do contend that Cypress Creek's tax-exempt status effectively ended in 1995,
when its original corporate purpose was alleged to have been altered by Cypress Creek's
formation of the Cypress Creek Advanced Tactical Team ("advanced tactical team" or
"Team"), and with the subsequent requirement that, as a condition for participating in any
"Team missions," members of the Team must become certified peace officers. 

 The Cosbys argue that when Team members who became peace officers were
subsequently commissioned through the Southeast Texas Narcotics Task Force located in
Silsbee, Texas, Cypress Creek operated "in the dual roles of medic and police officer."
Although continuing to operate in this so-called dual role of emergency medical service
provider and police agency, the Cosbys point out that Cypress Creek failed to modify its
articles of incorporation "to amend the corporate purpose to include law enforcement
services[,]" and failed to "notify the State of Texas or the Internal Revenue Service (IRS) of
the change in its purpose to determine whether such changes would affect the tax exempt
status." Therefore, the Cosbys contend the formation of the advanced tactical team
materially changed Cypress Creek's corporate purpose from solely emergency medical
services to emergency medical services and law enforcement, and because Cypress Creek
failed to amend its articles of incorporation to reflect said material change and failed to re-apply for tax-exempt status under a properly amended corporate purpose, it was no longer
a "governmental unit" as defined by the Texas Tort Claims Act. 

 The Cosbys attached a number of exhibits to their initial response in opposition,
including copies of the depositions of Cypress Creek's executive director, Bradley J.
England, and its director of special operations, Wrendell Re' Nealy, Jr., and of Charles A.
Malouff, Jr., a former law enforcement officer. The Cosbys also attached a copy of the
articles of incorporation of Cypress Creek which were executed in 1975, and a copy of a
1975 letter from the Texas Comptroller's office designating Cypress Creek as qualified for
a franchise tax exemption. 

 In the trial court, and now before us, the Cosbys' argument that subject matter
jurisdiction exists as to their claims against Cypress Creek is based entirely on the
presumption that Cypress Creek is no longer tax exempt in the eyes of both the Internal
Revenue Service and the Texas Comptroller's Office. At its core, this presumption is based
in part on the Cosbys' reading of the various code provisions involved in defining
"governmental unit," and in part on the Cosbys' strong reliance on Los Fresnos Volunteer
Fire Dep't, Inc. v. Davalos, No. 13-05-491-CV, 2006 WL 1113521 (Tex. App.- -Corpus
Christi Apr. 27, 2006, no pet.) (mem. op.). In Los Fresnos, Los Fresnos EMS responded to
a medical emergency call and during the course of treating the injured party, EMS employees
failed to properly intubate him. Id. at *1. He later died, and his wife filed suit against Los
Fresnos EMS. Id. Plaintiff delivered notice of suit to "Los Fresnos [EMS] by serving its
medical director, Dr. Carlos Chavez, M.D." Id. The entity filed an original answer referring
to itself as "Los Fresnos EMS." Id. However, a subsequent plea to the jurisdiction was filed
by an entity referring to itself as "Los Fresnos Volunteer Fire Department, Inc." In the plea
to the jurisdiction the entity claimed it had been improperly named as "Los Fresnos [EMS]." 
Id. The Fire Department contended that it was a governmental unit because of its status as
an "emergency service organization" as defined in the Texas Tort Claims Act. Id. The trial
court denied the Fire Department's plea to the jurisdiction, and the Fire Department appealed. 
Id.

 As did we, the Corpus Christi Court of Appeals traced the definition of "governmental
unit" through the pertinent definitions in the Texas Tort Claims Act and the Texas Tax Code. 
Id. at *2. The Court also framed the issue it faced as "whether appellant fulfills the statutory
definition of being an 'emergency service organization,' as this is necessary for appellant to
qualify as a 'governmental unit.'" Id. The Court then set out the relevant facts before it: (1)
the Fire Department received its articles of incorporation on July 3, 1974; (2) the stated
corporate purpose was "to operate a non-profit volunteer fire department . . . and for such
purpose to acquire, by purchase or otherwise, maintain and operate fire trucks and other fire
fighting equipment[;]" (3) in September of 1999, the Fire Department received an IRS
"determination letter" stating that the Fire Department was considered a 501(c)(3) exempt
organization; (4) the IRS letter and accompanying materials warned the Fire Department that
its tax exemption status might be jeopardized "if there is a material change, inconsistent with
exemption, in the character, the purpose, or the method of operation of the organization[;] (5)
in 2002, the Fire Department contracted with the City of Los Fresnos to take over operation
of Los Fresnos EMS, and with this new contractual arrangement the Fire Department began
paying taxes and wages for the Los Fresnos EMS employees - - something new to the Fire
Department, which had previously been a volunteer organization. (2) Id. 

 The Corpus Christi Court of Appeals held that the Fire Department's "exempt
organization" status changed when the Fire Department took on the responsibilities of
operating the Los Fresnos EMS for two reasons: (1) the Fire Department's corporate purpose
was solely fire fighting and no provision was made for any other services, including
emergency medical services, and (2) case law addressing "immunity" distinguishes between
volunteer organizations and those staffed by paid employees because of differing treatment
each type of organization receives under relevant statutory provisions. Id. at *2-* 3. From
this holding, the Court first concluded that the Fire Department could not claim the section
171.083 exemption "because it was not exclusively involved in the provision of emergency
medical services but, rather, continued to retain its fire-fighting and rescue duties." Id. at *3. 
The Court then addressed the Fire Department's 501(c)(3) tax exemption status, ruling as
follows:

 It also could no longer rely on its determination letter from the IRS
establishing its 501(c)(3) exempt status, given that it had substantially changed
its character and purpose. It was no longer a volunteer organization with the
sole purpose of fighting fires but instead had the dual purposes of fire fighting
and providing emergency medical services, and also had wage-making
employees. Thus, without being able to rely on its 501(c)(3) status, the Fire
Department also could no longer claim to be exempt under section 151.310 of
the tax code. 


Id. (citations omitted).

 In contrast, the record before us does not indicate that by establishing the Cypress
Creek Advanced Tactical Team, Cypress Creek substantially changed its character and
purpose. First, Cypress Creek's corporate purpose appears to be much broader in scope than
that of the Fire Department's as described in Los Fresnos. We reproduce the corporate
purpose of Cypress Creek as it appears in the record: 

 The purposes for which the corporation is organized are: To provide a
means for the acquisition and management of funds with which the
corporation shall fund and operate emergency medical and ambulance service
for the residents, businesses, and business invitees, visitors and any persons in
the F.M. 1960 - Cypress Creek area of Northwest Harris County, Texas; to
solicit and provide for the training of volunteer workers to provide such
services; to promote the goals of emergency medical service among the
professional medical community and provide a liaison between the corporation
and said medical community; and in general to promote the health, safety and
welfare of the F.M. 1960 - Cypress Creek Area; and to engage in any and all
other activities or functions which may be necessary or appropriate in
furtherance of the purposes as herein set out. To own, buy, sell, lease or
maintain real estate necessary to conduct operations; and to construct, own,
buy, sell, lease, equip and operate necessary buildings and equipment and other
appropriate facilities desirable and necessary in the conduct and operation of
the foregoing. 

 Notwithstanding any of the aforementioned purposes and powers, this
corporation will engage, otherwise than as an insubstantial part of its activities
[sic] only in activities that in themselves are in furtherance of educational, and
charitable purposes and in purposes that shall maintain the general health,
safety and welfare of the aforesaid area. 


The wording used here appears to be sufficiently elastic to allow Cypress Creek to provide
any type of emergency medical services, including a type of emergency medical service
presumably unforeseen by the drafters of the articles of incorporation in 1974. This is
evidenced by the phrase "to engage in any and all other activities or functions which may be
necessary or appropriate in furtherance of the purposes as herein set out" contained therein. 
As such, it cannot be said that its corporate purpose limited Cypress Creek to one type of
emergency medical service with a set format. 

 Additionally, the problem with a volunteer organization suddenly taking on paid
employees that was so vexing to the Corpus Christi Court is not present under the record
before us. Indeed, precisely the opposite appears to be the case here. The following portions
of the deposition of Bradley England, executive director of Cypress Creek, set out this
distinction: 

 Q.[Cosbys' Counsel] We're sitting here today in the year 2005. Fair to say
that you started work with Cy Creek EMS in 1990?


 A.[England] '89 actually, yes.


 Q. When you went to work for Cy Creek EMS, was that a paid position or a
volunteer position?


 A. Paid position. 


 Q. As executive director?


 A. When I first started, I was a paramedic supervisor and then I became the
executive director.


 . . . .


 Q. Other than volunteering for Hempstead Police Department, have you ever
been employed by a police department or policing agency?


 A. No, sir.


 . . . .


 Q. When was it that the initial contact was made with Cy Creek EMS about
establishing the advanced tactical team?


 A. Two or three months after Waco, and I think Waco happened in '94.


 Q. And how long was it after that initial contact before the advanced tactical
team was established?


 A. I couldn't say. I don't remember. Six months. 


 Q. And who was the head of the advanced tactical team?


 A. Myself. 


 . . . .


 Q. Were all of the [members of that initial advanced tactical team] employees
of Cy Creek EMS?


 A. Yes. 


 Q. Paid employees?


 A. Yes.


 Q. No volunteers?


 A. No.


 . . . .


 Q. But I guess getting back to my earlier point, since its inception, the Cypress
Creek Advanced Tactical Team has been a part of Cypress Creek EMS?


 A. That's correct. 


 Q. It's been a part of the day-to-day operations of Cypress Creek EMS since
'94 or '95?


 A. That's correct.


 . . . .


 Q. Do the members of the advanced tactical team get paid anything more for
being on the team?


 A. No.


 Q. It's just something in addition to their duties as an employee of Cypress
Creek EMS?


 A. That is correct.


 Q. Each of the members of the advanced tactical team are employees of
Cypress Creek EMS, correct?


 A. That is correct. 


 Q. No volunteers, right?


 A. There has been in the past.


 Q. Did something occur that made Cypress Creek EMS change its position on
that?


 A. As far as not volunteers?


 Q. Yes.


 A. No.


 Q. Just the volunteer quit?


 A. Yes.


 From the preceding testimony, it appears that in our case the initial tax-exempt entity
consisted of paid employees and later established a more specialized branch of the entity with
no added compensation to those employees who choose to take on the added duties and risks. 
Recall that in Los Fresnos, the entity changed from a purely voluntary tax-exempt entity to
one taking on an entirely separate and distinct entity made up of paid employees. See Los
Fresnos, 2006 WL 1113521 at *3. Los Fresnos is therefore distinguishable on its facts. 
Additional evidence attached to the Cosbys' initial response in opposition indicates the
advanced tactical team considered as its mission to provide medical services under certain
logistical circumstances ["high-risk situations," or "crisis incident"] that have traditionally
been considered too dangerous for the typical provider of emergency medical services. 

 The evidence before us indicates the overriding purpose of the advanced tactical team
has always been to provide medical services, with law enforcement being a marginal purpose
at best. Proof of this is again found in the deposition testimony of Bradley England: 

 Q.[Cosbys' Counsel] You were not authorized to carry firearms, correct?


 A.[England] Not at the beginning, that's correct.


 Q. It was purely a medical assistance team?


 A. That's correct.


 Q. Did that change from a pure medical assistance team to something else?


 A. It changed where we were in the mix of the event. Being a - - truly a
medical team, we were staged two or three blocks away. If an incident
happened on scene, it would take us two or three minutes to get there. And
then they had to make sure the scene was safe for us to go in. As the team
progressed and we became police officers, we are at the scene. We are in the
midst of whatever happens. So, if someone goes down, we're right there right
then at the time and we don't have to worry about them securing the scene. 
We already are a part of that. 


 Q. And your role, then, changed from purely a medical role to one of being
law enforcement/medical role. Is that fair?


 A. Other way around. Medical role, but if we had to be a police officer, we
could cuff the individual. We could take anything down that he would say. 
It would still be a law enforcement person hearing it, but our main role is a
medical person.


 Q. Whether it's the main role or not, there's still an additional role there,
which is law enforcement, correct?


 A. To protect ourselves, the patient and the people around us, yes.


 Q. And I'm not trying to mince words with you here, but it's a medical and
law enforcement role, correct?


 A. Not necessarily. We are always a police officer and we are always a
paramedic. Our main job for the team is a medic. We are not there to be the
sniper. We are not there to take the shot. We are not there to - - we're not
there for that. We're there for the medical part of it. If we need to protect
ourselves, protect the patient or protect anyone around us, we switch roles and
become a police officer.


At the request of counsel for the Cosbys, Bradley England was permitted to narrate a brief
history of the advanced tactical team. The following is England's explanation for having the
members of the advanced tactical team become certified peace officers: 

 [England]: A lot of doors got shut in Cypress Creek EMS face, per se,
because we were not law enforcement agents or an agency. So, what they
would do is "Hey, medic, you go stand outside. We'll talk to you later. This
is an important briefing and you don't need to hear all this important stuff"
when we did have things to say, "Hey, it's 105 degrees out there. You guys
are going to get dehydrated fast. When you start getting a headache, you're
getting dehydrated. You need us in there to help you out." So, for about the
first year, a lot of doors were closed. The medics sat out about two or three
blocks down the road, didn't really do anything.

 After that, we became - - Gene [Williams] said, "Hey, you guys need to
become law enforcement officers. That's the only way this is" - - "the
program is going to work." We started going to school, did the basic class, the
intermediate and the advanced class all within a year and a half, all became
police officers. At that time, we became part of the Southeast Narcotics Task
Force as a medic and as a police officer. When they were doing buys in a bar,
we could go in the bar 30 minutes prior to the alleged person going in to sell
the drugs and before the two undercover guys would go in and we would be
their cover. We would sit there as a law enforcement agent just to make sure
that everything was safe. As long as we never saw a weapon, a gun or a knife,
we let them do the buy and they left. We left 30 minutes, 40 minutes after they
did that. Those are some of the things that we did for that agency along with
being a medic. If anybody got hurt, we were there at the time. 


 We recognize that this portion of Cypress Creek's plea to the jurisdiction
("governmental unit" issue) is not so much a challenge to the Cosbys's pleadings, but,
instead, a challenge to the existence of jurisdictional facts. See Miranda, 133 S.W.3d at 226-27. Our examination of the relevant jurisdictional facts indicates Cypress Creek established
it was a "governmental unit"as set out in the Texas Tort Claims Act. See Tex. Civ. Prac.
& Rem. Code §101.001(1), (3)(C). Cypress Creek presented a letter indicating it is
"currently exempt under section 501(c)(3) of the Internal Revenue Code." The record also
contains the letter of December 2, 1975, from the Texas Comptroller's Office further
evidencing Cypress Creek's tax-exempt status. In their attempt to deconstruct that exemption
status, the Cosbys have failed to present any probative evidence to the contrary, such as
authoritative evidence from either the IRS or the Texas Comptroller's Office that calls into
question Cypress Creek's current exempt status. Their argument that Cypress Creek acts as
a law enforcement agency or provides law enforcement services completely separate and
distinct from its established purpose of emergency medical services is not shown by the
record evidence. All the evidence indicates the core function of the advanced tactical team
is not inconsistent with the exemption granted to Cypress Creek by the IRS in 1975. The
additional argument that Cypress Creek has lost tax-exempt status because its emergency
medical services have not remained at what amounts to 1975 state-of-the-art levels, has no
support in fact or in law. We find, therefore, that Cypress Creek EMS is a governmental unit
and is entitled to invoke the protections set out in the Texas Tort Claims Act. Issue one is
sustained.

II. HAVE THE COSBYS ESTABLISHED WAIVER OF IMMUNITY?


 In their petition, the Cosbys allege, inter alia, that "at all times material to this matter
Defendant Williams was employed by Defendant [Cypress Creek] and was acting within the
course and scope of his employment when he misused tangible personal property that
resulted in the injury and damages to Plaintiffs." For the limited waiver of sovereign
immunity to be triggered under the Texas Tort Claims Act, the personal injury suffered must
be, inter alia, "proximately caused by the wrongful act or omission or the negligence of an
employee acting within his scope of employment . . . . See id. § 101.021(1). The Act defines
scope of employment as "the performance for a governmental unit of the duties of an
employee's office or employment and includes being in or about the performance of a task
lawfully assigned to an employee by competent authority." See id. § 101.001(5). 

 Generally, "an employer is liable for its employee's tort only when the tortious act
falls within the scope of the employee's general authority in furtherance of the employer's
business and for the accomplishment of the object for which the employee was hired." 
Minyard Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002) (citing Robertson
Tank Lines, Inc. v. Van Cleave, 468 S.W.2d 354, 357 (Tex. 1971)). The Texas Supreme
Court has further held that, for an employee's acts to be within the scope of his employment,
"the conduct must be of the same general nature as that authorized or incidental to the
conduct authorized." Id. (quoting Smith v. M Sys. Food Stores, Inc., 156 Tex. 484, 297
S.W.2d 112, 114 (1957)). "In other words, if an employee deviates from the performance
of his duties for his own purposes, the employer is not responsible for what occurs during
that deviation." Id. (citing ITT Consumer Fin. Corp. v. Tovar, 932 S.W.2d 147, 158 (Tex.
App.--El Paso 1996, writ denied)).

 In the instant case, the Cosbys do not contest the fact that Williams detonated the
NFDD at his residence during a private party. There is a complete lack of any jurisdictional
facts indicating that in doing so, Williams was acting in furtherance of Cypress Creek's
business, or indicating that Williams' conduct was of the same general nature as conduct
authorized by Cypress Creek. Nor is there any evidence that when the NFDD exploded
injuring Steven Cosby, Williams was performing a task lawfully assigned to him by Cypress
Creek. The Cosbys have, therefore, failed to establish a waiver by Cypress Creek of its
immunity from suit pursuant to sections 101.021 and 101.025 of the Texas Tort Claims Act. 
See Tex. Civ. Prac. & Rem. Code §§ 101.021, 101.025. Issue two is sustained. As we have
found that Cypress Creek is a governmental unit, and that the Cosbys have failed to establish
a waiver of immunity or a consent to suit by Cypress Creek, the trial court lacked subject
matter jurisdiction. We reverse the trial court's order denying Cypress Creek's plea to the
jurisdiction, and we render judgment dismissing the Cosbys' claims against Cypress Creek
Emergency Medical Services, Inc. for want of jurisdiction.

 REVERSED AND RENDERED.


 __________________________________

 CHARLES KREGER

 Justice


Submitted on December 7, 2006

Opinion Delivered March 8, 2007



Before McKeithen, C.J., Kreger and Horton, JJ.
1. The remaining defendants, Eugene H. Williams, Jr., Charles A. Malouff, and Cypress
Creek Advanced Tactical Team, Inc., are not parties to the plea to the jurisdiction or to this
appeal.
2. All emphasis in this opinion is added unless otherwise noted.