**INVESTMENT PROPERTIES MANAGEMENT, INC. d/b/a Sandpiper Apartments, Appellant,**

v.

**Elsa Rosa Chavez De MONTES, Appellee.**

**No. 08–91–00060–CV.**

Court of Appeals of Texas, El Paso.

Dec. 4, 1991.

Rehearing Overruled Jan. 2, 1992.

Aubrey J. Fouts, Donald M. Hunt, Carr, Fouts, Hunt, Craig, Terrill & Wolfe, Lubbock, for appellant.

Enrique Moreno, Moreno & Fry, El Paso, for appellee.

Before OSBORN, C.J., and WOODARD and KOEHLER, JJ.

## OPINION

KOEHLER, Justice.

This case involves the difficult and troublesome problem facing an employer, particularly one with a limited number of employees, who finds it necessary to terminate a job-injured employee on temporary total disability in order to fill the position with a permanent employee, without becoming liable for a wrongful termination.

In this wrongful discharge suit, the Appellee, Elsa Rosa Chavez De Montes

(Montes), alleged that her former employer, Investment Properties Management, Inc. (IPMI), Appellant, in violation of Tex.Rev. Civ.Stat.Ann. art. 8307c (Vernon Supp. Pamphlet 1991) of the Workers' Compensation Act, terminated her employment as a result of her having pursued a workers' compensation claim. The jury found that the termination was wrongful and that IPMI acted willfully or maliciously in discharging her, awarding her $10,000 actual and $100,000 exemplary damages. In four points of error, IPMI asserts legal and factual insufficiency of the evidence to support (A) a causal connection between the discharge of Montes and the pursuit of her compensation claim (points one and two), and (B) the finding that IPMI acted maliciously (points three and four). We affirm.

Montes began working as a housekeeper for the Sandpiper Apartments in El Paso in August 1984. IPMI became the managers of the property in July 1986. Dwight Allen (Allen) was IPMI's property supervisor with offices in Lubbock. Mary Ann Mahan (Mahan) was IPMI's, as well as the previous manager's, resident manager of the Sandpiper Apartments. When IPMI took over management of the property, Allen interviewed Montes to determine if she should be retained. She was hired by IPMI after that interview. Montes was considered a good worker and was never reprimanded nor did she receive any warnings.

On November 25, 1987, the day before Thanksgiving, Montes slipped and fell while hanging wallpaper, injuring her back. Mahan was on vacation at the time and so Montes reported her injury to the assistant manager who sent Montes home to rest. Montes first went to see a Juarez doctor because she did not have any money and did not know about workers' compensation. She called the assistant manager on Friday to keep her informed and called again the following Monday, this time speaking to Mahan.

Initially, Montes sought medical help from an emergency doctor in Juarez. When Montes told Mahan that the Juarez doctor said Montes should be able to return to work in two weeks or more, Mahan told her that she would wait for her to get well. Montes did not recover quickly. After trying an El Paso chiropractor with unsatisfactory results, she put herself under the care of an El Paso orthopedic surgeon in January. Montes was put on a physical therapy routine and given medication. She would personally, or have someone else, deliver notes from the physical therapist and doctor on a weekly or monthly basis to Mahan's office between January and August 1988, but was able to speak directly to Mahan on only three occasions. Montes first contacted an attorney on December 24.

On January 14, 1988, Mahan hired Maria Altamirano (Altamirano) as a temporary housekeeper to replace Montes while she was incapacitated. It was Mahan's intention that if Montes had not returned by the end of Altamirano's ninety day probationary period, Altamirano would be made a permanent employee. She told no one of her intention, including Montes, Altamirano and Allen.

Approximately eight and a half months after being injured, on Friday, August 12, 1988, Montes obtained a note from her doctor releasing her to return to work beginning August 15 with no heavy lifting. The doctor at the same time by letter informed the insurance carrier of the release for work, rating her impairment at no less than 10 percent permanent disability. She immediately took the note to Mahan so that she could return to work. She was notified by Mahan on the following day that she no longer had a job.

■ Under its first two points of error, IPMI attacks the legal and factual sufficiency of the evidence to support the necessary causal connection between the employment termination and the compensation claim. We are aware that when confronted with a "no evidence" challenge, we should consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury verdict or court finding. All evidence and inferences to the contrary are to be disregarded. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Alu-*

*minum Company of America,* 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the questioned finding, the no evidence point fails. *Stafford,* 726 S.W.2d at 16.

When a factual sufficiency challenge is brought, we must first examine all of the evidence, *Lofton v. Texas Brine Corporation,* 720 S.W.2d 804, 805 (Tex.1986); and after considering and weighing all of the evidence, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Since an appellate court is not a fact finder, we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if the evidence would support a different result. *Clancy v. Zale Corporation,* 705 S.W.2d 820, 826 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

Article 8307c of the Texas Revised Civil Statutes provides that an employer who discharges any employee because that employee has in good faith filed a claim, or hired a lawyer to represent him in a claim, under the Workers' Compensation Act shall be liable for reasonable damages suffered by the employee. Under the article, the employee has the burden of proving a wrongful discharge. Tex.Rev.Civ.Stat. Ann. art. 8307c (Vernon Supp.Pamphlet 1991).

■ Causation may be established either by direct or by circumstantial evidence and by the reasonable inferences from such evidence. *Paragon Hotel Corporation v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.— El Paso 1989, writ denied). The terminated employee "has the burden of establishing a causal link between the firing and the employee's claim for worker's compensation benefits[;]" *Hughes Tool Company v. Richards,* 624 S.W.2d 598, 599 (Tex.Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). But she does not need to prove that the discharge was caused solely by the workers' compensation claim; she merely has to show a causal connection between her discharge and her claim for benefits. *Azar Nut Company v. Caille,* 720 S.W.2d 685, 687 (Tex.App.—El Paso 1986), aff'd, 734 S.W.2d 667 (Tex. 1987). Once the employee has established the link, it is the employer's burden to rebut the alleged discrimination by showing that there was a legitimate reason behind the discharge. *Hughes,* 624 S.W.2d at 599.

Since there is no direct evidence of a causal connection in this case, it must be established, if at all, by circumstantial evidence and the reasonable inferences therefrom. From a review of the testimony and the exhibits, we conclude there is sufficient evidence to withstand both challenges. The evidence which supported the causal connection in *Paragon* is instructive as to the sort of circumstantial evidence which could tend to establish the connection in this case. However, each case must stand on its own. In this case, as in *Paragon,* there was some evidence that at the time they decided to terminate Montes (according to Mahan, sometime in April), Mahan and Allen knew not only about Montes' claim (obvious) but knew that she was represented by an attorney. They initially testified that they were unaware or had forgotten that an attorney was representing Montes on her compensation claim. They both testified that if they had known about an attorney in the case, they undoubtedly would have discussed that fact with each other. Later, they both admitted that they were aware that she had an attorney on her compensation claim long before even the uncommunicated termination in April.

In *Paragon,* there was evidence of a negative attitude shown toward the injured employee. Here too, there is evidence, albeit conflicting, of a negative attitude by IPMI management toward Montes' injury and her claim. When Montes first talked with Mahan after her injury, Mahan sounded upset after Montes explained what had happened. Montes testified that Mahan told her that she should have been more careful. Mahan claimed that she was upset not because Montes had carelessly injured herself but because neither Montes nor the assistant manager had promptly

informed her of the accident. This was belied by the fact that Mahan was on vacation at the time of the injury and thought to be unavailable.

Although Mahan denies it, there is evidence that Mahan did little to help Montes process her claim. After Montes told Mahan that she had first seen a doctor in Juarez, Montes felt that it was strange that Mahan did not tell her to see an El Paso doctor but told her she hoped "I would be all right." She claimed that it was her brother, not Mahan, who first informed her that she could see an El Paso doctor and that her medical bills would be covered by workers' compensation. According to Montes but denied by Mahan, she called Mahan frequently between November 30 and December 24 to keep Mahan informed on her condition. As time wore on, Montes noticed that Mahan became increasingly upset and unhelpful. According to Montes, it was because of Mahan's lack of concern that she sought legal assistance in December to get help on her claim. Some of the exhibits admitted into evidence suggest that Mahan did not immediately submit the Employer's First Report of Injury to the Industrial Accident Board as she claimed. Montes did not begin to receive weekly compensation until mid-February 1988.

■ There was evidence that Mahan failed to follow established company policy with regard to the hiring and discharging of employees. Evidence that the stated reason for the discharge is false and that established company policies were not followed in the termination process is probative of an improper motivation in the discharge. *Paragon,* 783 S.W.2d at 660.

Mahan claimed that as far as she was concerned, Montes ceased to be an IPMI employee sometime in April although Mahan informed no one and, contrary to company policy, did not do the necessary paperwork to terminate Montes and permanently employ Altamirano. Montes was never told by Mahan or anyone else that she would have to return to work by a certain date or she would lose her job. On the contrary, in talking with Mahan and other Sandpiper employees, she was led to be-

lieve that she would get her job back. According to Mahan, she discussed hiring Altamirano on a permanent basis with Allen sometime in April but wanted to leave the file open in case Altamirano quit or they had a new position, they would "have hired Ms. Montes back." Mahan on May 10, 1988 submitted a supplemental report of injury to the Industrial Accident Board which did not indicate that Montes was no longer considered an employee of IPMI. Also contradictory to Mahan's testimony was that of Beverley LeMaitre, a rehabilitation nurse employed by the insurance carrier to facilitate Montes' return to work. She interviewed Mahan in late May 1988 to determine what Montes' duties at work would be. From her conversation with Mahan, LeMaitre assumed the position was still open for Montes to return. She was not told by Mahan that Montes had been terminated. LeMaitre got the impression that Mahan was anxious for Montes to return to work and in a follow-up letter, expressed regret to Mahan that she could not be specific as to when Mahan could anticipate Montes' return.

The testimony of Mahan and Montes is in sharp conflict as to what was said on the day Montes personally delivered the doctor's note releasing her for work to Mahan. Montes testified that Mahan told her that she could start working on Monday, August 15. Mahan claimed that when Montes came in with the note, Montes did not state that she wanted to return to work. Inconsistently, Mahan then testified that she did not tell Montes anything other than she would have to discuss "the situation" with Allen. That situation would almost have to be that Montes wanted to return to work. In any event, on August 13, Mahan telephoned Montes and told her that Allen and she had decided that Montes no longer had a job.

Mahan admitted that she did not tell Montes on August 12 that her position had been filled by Altamirano on a permanent basis. The documentary evidence shows that Altamirano had been hired as a "temporary housekeeper." The payroll information sheet indicates that Altamirano was

not changed from temporary to permanent status until September 1, 1988. The records also show that IPMI was paying Montes $3.75 per hour at the time she was injured; it started Altamirano at $3.40 per hour in January and continued to pay her the same hourly rate after she was made permanent. This could have provided a reason or additional reason for the termination but neither Mahan or Allen so claimed. Although Mahan testified that IPMI would rehire Montes if there was an opening, the termination report, dated September 1, 1988, submitted by Mahan to IPMI recommended that she not be rehired. At one point, Mahan testified that she discussed the "no heavy lifting" restriction with Allen on August 12 but in her earlier deposition, she could not recall that the subject came up in the discussion. She also testified that Montes did not appear to be upset when informed she no longer had a job, but in the deposition, she said that Montes was upset.

Allen's testimony was also contradictory. Allen testified that the choice was whether or not to fire Altamirano who had been working as the housekeeper from January to August. He did not know anything about a ninety day probationary period for Altamirano as asserted by Mahan. He did not remember a discussion with Mahan in April about Montes no longer being considered an IPMI employee. At one point, Allen testified that Montes failed to follow three procedures required by company policy which played a factor in her dismissal. There were: (1) not going to the nearest medical facility to get checked; (2) not reporting the accident for several days; and (3) not staying in communication with IPMI. The evidence was clear that Montes immediately reported her injury to the assistant manager and to Mahan as soon as she knew where to find her. The assistant manager told her to go home, not to the nearest doctor, nor did Mahan ever suggest that she should go to a nearby medical facility. Furthermore, the evidence was that Montes, on a weekly basis, delivered personally or through a friend, medical and physical therapy reports to Mahan's office.

From the numerous inconsistencies and contradictions, the jury could have disbelieved much of Mahan's and Allen's testimony including the reasons given by them for her discharge. If the jury did not believe the stated reasons, it could infer from the evidence that Montes was dismissed for the improper motive prohibited by Article 8307c. We conclude that the circumstantial evidence and reasonable inferences are both legally and factually sufficient to show a causal link between Montes' compensation claim and her discharge from the job. Points of Error Nos. One and Two are overruled.

In Points of Error Nos. Three and Four, IPMI asserts no evidence or factually insufficient evidence to support both the finding that IPMI had acted maliciously and the assessment of $100,000 as exemplary damages based on that finding. The charge defined a "malicious or willful" act as "an intentional wrongful act done without just cause or excuse before one believes it to be right or legal or done with conscious disregard for the rights of others." It added that "[w]illfulness and malicious intent may be inferred from the conduct of the wrongdoer." IPMI does not complain on appeal that the definition given was erroneous. It cites *Southwestern Investment Company v. Alvarez*, 453 S.W.2d 138, 141 (Tex.1970) for the proposition that the act must be not only unlawful but must be of a wanton and malicious nature. IPMI emphasizes that the key to malice is evidence of intent and motivation.

We have previously concluded under the first two points of error that there is sufficient evidence to show that Mahan and Allen, on behalf of IPMI, decided to terminate Montes only after she showed up on August 12 with a medical discharge and ready to return to work. Mahan admitted knowing that it was illegal to discriminate against an employee because she was pursuing a claim under the workers' compensation laws.

The evidence heretofore summarized, including the reasonable inferences drawn from such evidence, supports a jury finding

that the termination was an intentional act done either without just cause or with conscious disregard for the rights of Montes. Although Mahan gave a valid reason for deciding to keep Altamirano in preference to Montes, the jury obviously did not believe her, perhaps because of the inconsistencies in her and Allen's testimony, e.g., the insistence of Allen that the question came down to whether they should fire Altamirano, not whether they should fire or rehire Montes. He was unwilling to admit that Montes was still an employee but inconsistently claimed she could not be rehired because "her paperwork" was still open. Mahan claimed that Montes could not be rehired because her position had been permanently filled in April. Allen took the position that the termination decision was made in August. Although Mahan and Allen averred no ill will toward Montes and Mahan claimed that she would rehire Montes if a position became available, the termination report on Montes indicated otherwise. The credibility of the witnesses was for the jury to determine.

The jury having found that the act of discharging Montes was motivated by malice, the amount of exemplary damages to be assessed against the wrongdoer was then largely within the discretion of the jury. The jury was correctly instructed that it could consider several factors in arriving at an appropriate amount of such damages, including the nature of the wrong, the frequency of the wrongs committed, the character of the conduct involved, the degree of the wrongdoer's culpability, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety and the amount needed to deter similar wrongs in the future. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). There was evidence which the jury could have considered with respect to several of those factors. There is no set ratio between the actual and exemplary damages which will be considered reasonable. Each case stands on its own facts. *Kraus v. Alamo National Bank of San Antonio*, 586 S.W.2d 202, 207–8 (Tex. Civ.App.—Waco 1979), aff'd, 616 S.W.2d

908 (Tex.1981). Unless the award is so large as to indicate that it was the result of some improper motive such as passion or prejudice, the verdict of the jury is conclusive and will not be set aside on appeal. *Kraus*, 586 S.W.2d at 208. Under that criterion, we do not find the award of exemplary damages in this case to be excessive. Points of Error Nos. Three and Four are overruled.

Judgment is affirmed.