Felipe URQUIDI, Appellant,

v.

PHELPS DODGE REFINING CORPORATION,
Appellee.

No. 08–97–00097–CV.

Court of Appeals of Texas,
El Paso.

July 2, 1998.

Rehearing Overruled Aug. 12, 1998.

Bruce Yetter, El Paso, for Appellant.

James T. McNutt, Joseph L. Hood, Jr., Benjamin A. Escobar, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, for Appellee.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Felipe Urquidi (Urquidi) filed suit against his former employer, Phelps Dodge Refining Corporation (Phelps Dodge), alleging that he was terminated in violation of Tex.Lab.Code Ann. § 451.001 (Vernon 1996). The trial court entered a directed verdict and rendered judgment in favor of Phelps Dodge. Finding no evidence of a causal connection between Urquidi's termination and his claim for workers' compensation benefits, we affirm.

## FACTUAL SUMMARY

Beginning in 1968 and continuing until a labor strike in 1983, Urquidi worked in what is known as the yard department at Phelps Dodge. As a result of the strike, Urquidi was off of work until March of 1988, when he returned and was assigned to the tank house. On November 2, 1988, Urquidi was injured on the job when he was struck by heavy copper plates. He suffered a laceration to a finger on his left hand. Following treatment by company doctors, Urquidi was released to go back to work; he was placed in a light duty job until December 27, 1988. Urquidi was unaware that his doctor had released him for full duty work. When he was placed in a full duty assignment which required gripping with his hands, he protested because he did not believe he could perform the job due to his injury. Urquidi was returned to light duty the following day after he visited with the company doctor. He remained in a light duty position until December 27 when his medical restrictions were lifted. He was then reassigned to the position he held prior to his injury and he remained in that job until February or March of 1989.

Urquidi continued to experience pain in his upper arms and wrists. He was referred to another physician in January of 1989, but that doctor did not note any disability or

recommend further treatment. On May 8, 1989, Urquidi was examined by Dr. Monsivais, an orthopedic surgeon, who placed both of Urquidi's hands in splints. Urquidi was not permitted to return to work and he filed a workers' compensation claim on that same date. In October of 1989, Urquidi underwent carpal tunnel release surgery on his left arm. He attempted to return to work in April of 1990. On April 18, Urquidi underwent a work tolerance test, also known as a functional capacity assessment, at the request of Dr. Monsivais. That evaluation revealed that he had an impairment rating of 17 percent to his left hand, 31 percent to his upper left extremities, 10 percent to his right hand, and 11 percent to his upper right extremities. The evaluator concluded that Urquidi could return to work only if modifications were made. On June 28, 1990, Dr. Monsivais released Urquidi to work with the limitations that he not lift over fifty pounds, and that he refrain from performing overhead work and repetitive movements. Urquidi presented this release to Dana Wray, the company's personnel director, on June 29, 1990. Wray informed Urquidi that there were no light duty jobs available and he could not return to work with the limitations placed upon him by Dr. Monsivais. However, if the restrictions were removed, he could return to work. As a result, Urquidi consulted Dr. Monsivais and began a work strengthening program. He had a second operation on his left arm on July 10, 1991 and underwent surgery on his right arm on November 2, 1991. Urquidi continued physical therapy in an effort to return to work.

In December of 1991, Urquidi spoke with Dr. Monsivais and requested that he be given a full release to return to work without restrictions. In January of 1992, Urquidi had a second work tolerance test which showed an impairment rating of 17 percent on each hand, 31 percent on his left upper extremity and 27 percent on his right upper extremity. By February, Dr. Monsivais had still not cleared Urquidi to return to work. Urquidi returned to Dr. Monsivais on March 2, 1992 and insisted that he be released. Although Dr. Monsivais was reluctant and did not agree from a medical standpoint, he provided the release to Urquidi. After Urquidi presented the release to Phelps Dodge, he was sent to the company's doctor, Dr. Becker. Pursuant to a company policy, Phelps Dodge required Urquidi to undergo a physical examination and drug test before he could return to work. Dr. Becker did not release Urquidi to return to work because his total body impairment rating of 32 did not allow him to adequately perform the duties of his job.

Urquidi obtained another release from Dr. Monsivais on March 26, 1992, which he gave to Phelps Dodge in August of 1992. The company again required him to take a physical examination and drug test. Dr. Becker referred Urquidi to Dr. Cayaretta for conductive testing. The results were abnormal. On February 5, 1993, Urquidi took a second work tolerance test at the request of Dr. Monsivais. Although Urquidi testified that he "passed" the test, the test itself reflects that Urquidi could not perform all of the critical demands of his job due to an inability to grasp with his left hand or lift more than 73 pounds. On February 26, 1993, Dr. Monsivais issued a full release for Urquidi to return to work without limitations. Urquidi took the release to the company nurse. As the nurse spoke with Urquidi, the company's safety director, Bill McInnes, walked in and the nurse advised him that Urquidi was returning to work. McInnes reminded the nurse that company procedures had to be followed. McInnes walked out of the nurse's office, called her on the telephone, and informed her that Urquidi had to undergo a physical and drug test before he could return to work. Those tests were performed on March 2, 1993. Urquidi was also required to perform a work tolerance test which was conducted on May 4, 1993. That evaluation revealed that Urquidi's tolerance to activities did not match the critical demands of his job. Because Urquidi experienced an elevated heart rate during part of the test, Dr. Becker referred him to a cardiologist for evaluation. That exam was performed on July 8, 1993 and revealed no evidence of heart disease but indicated that Urquidi was deconditioned. On July 16, 1993, Dr. Becker determined that Urquidi could not return to work based on the results of the work tolerance test. Fur-

ther, on July 21, 1993, Dana Wray wrote Urquidi and informed him that it was "difficult if not impossible" to consider returning him to work in light of Dr. Monsivais' June 17 determination in a medical report filed with the Workers' Compensation Commission that Urquidi would "never" return to full-time work.

Urquidi filed suit on November 15, 1993, alleging that Phelps Dodge had terminated him in violation of Section 451.001 of the Texas Labor Code. The trial court granted Phelps Dodge's motion for directed verdict on the ground that Urquidi had not established the requisite causal connection between his filing of a workers' compensation claim and his discharge.

## DIRECTED VERDICT

■ By three points of error, Urquidi challenges the granting of a directed verdict in favor of Phelps Dodge on the issue of causation. A directed verdict is proper: (1) when a defect in the opponent's pleadings makes them insufficient to support a judgment; (2) when the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) when the evidence offered on a cause of action is insufficient to raise an issue of fact. *ITT Consumer Financial Corp. v. Tovar,* 932 S.W.2d 147, 159 (Tex.App.—El Paso 1996, writ denied). In reviewing the granting of a directed verdict by the trial court on an evidentiary basis, we determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Id.* at 159, *citing Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). We consider all of the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences arising therefrom. *White v. Southwestern Bell Telephone Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983); *ITT Consumer Financial Corp.,* 932 S.W.2d at 159-60. If there is any conflicting evidence of probative force on any theory of recovery, the issue is for the jury; an instructed verdict is improper and the case must be reversed and remanded for the jury's determination on that issue. *White,*

651 S.W.2d at 262; *ITT Consumer Financial Corp.,* 932 S.W.2d at 160. Where no evidence of probative force on an ultimate fact element exists or where the probative force of the testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *Id.*

## CAUSAL CONNECTION

■ This Court has previously held that in an Article 8307c case, the employee has the burden of establishing a causal connection between the termination and his claim for workers' compensation benefits. *Investment Properties Management, Inc. v. Montes,* 821 S.W.2d 691, 694 (Tex.App.—El Paso 1991, no writ); *Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.—El Paso 1990, writ denied). We also concluded in *Montes* that the employee need not prove that the compensation claim was the sole cause of the termination; he merely has to show that it contributed to the employer's decision to terminate him. *Montes,* 821 S.W.2d at 694; *Mid–South Bottling Co. v. Cigainero,* 799 S.W.2d 385, 390 (Tex.App.—Texarkana 1990, writ denied). Agreeing that the plaintiff need not prove that his filing of a workers' compensation claim was the *sole cause* of his termination, the Supreme Court has articulated the standard of causation for anti-retaliation cases under Section 451.001 of the Labor Code: the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did. *Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450-51 (Tex.1996). Thus, we must determine whether there is any evidence of probative force to raise a fact issue on the question whether, but for Urquidi's filing of a workers' compensation claim, Phelps Dodge would not have terminated him when it did. *Id.* Circumstantial evidence that has been recognized as supporting a finding of unlawful discrimination includes:

- the employer's knowledge of the compensation claim by those making the decision to terminate;

- a negative attitude towards the employee's injured condition;

- failure to adhere to established company policies;
- discriminatory treatment of the injured employee in comparison to similarly situated employees; and
- providing incentives to refrain from reporting on-the-job injuries.

*Montes,* 821 S.W.2d at 694–95; *Paragon,* 783 S.W.2d at 658–59; *see America West Airlines, Inc. v. Tope,* 935 S.W.2d 908, 912–13 (Tex.App.—El Paso 1996, no writ). Further, proof that the stated reasons for discharge are false is sufficient to establish that the employee was terminated in violation of Section 451.001. *Continental Coffee,* 937 S.W.2d at 452; *see Paragon,* 783 S.W.2d at 660.

### Knowledge of the Workers' Compensation Claim

It is undisputed that Dana Wray, Phelps Dodge's personnel director, had knowledge of Urquidi's compensation claim. This fact, standing alone, does not satisfy the *Continental Coffee* standard; it simply places Urquidi within the protected class and must be considered along with the remaining evidence.

### Negative Attitude

■ In attempting to demonstrate that the directed verdict is improper, Urquidi contends that Phelps Dodge has a negative attitude towards injured employees. As evidence, Urquidi points first to the company's practice of requiring employees who were absent from work for more than thirty days due to illness or injury to undergo a physical examination and to be cleared by the company doctor before returning to work. He argues that this policy provides employees with an incentive to return to work before they have recuperated from their on-the-job injuries. Although Urquidi maintains that this policy has an adverse effect primarily on workers' compensation claimants, there is no evidence in the record to support this assertion. Wray testified that the policy applies to all employees who are absent due to illness or injury, whether the injury occurred on or off the job. Likewise, Urquidi offered no evidence that any employees had returned early to work in order to avoid application of this policy. An employer must be permitted to determine if an employee seeking reinstatement is physically able to perform the duties of his job. *See Schrader v. Artco Bell Corp.,* 579 S.W.2d 534, 539–40 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.)(burden was on discharged employee, seeking reinstatement on ground that he was wrongfully discharged because he had filed two compensation claims, to show that he was presently able to perform the duties of the job which he had before his injury). This is a valid employment policy which protects not only the returning employee from further injury or illness but other employees who might be placed in danger by a co-worker's inability to physically perform his job. Legally justified conduct is not probative of discrimination under Section 451.001 nor is it evidence of a negative attitude. *Continental Coffee,* 937 S.W.2d at 451–52. In the absence of any evidence of discriminatory application or impact on workers' compensation claimants, we cannot infer a negative attitude or discrimination in violation of Section 451.001 from the existence of this otherwise lawful employment policy. *See Continental Coffee,* 937 S.W.2d at 451 (uniform enforcement of a reasonable absence-control provision does not constitute retaliatory discharge).

Urquidi next points to the conduct of Bill McInnes, Phelps Dodge's safety director, as demonstrating a negative attitude. Urquidi obtained a release from his own physician in early 1993, and took it to the company nurse. As the nurse spoke with Urquidi, McInnes walked in and the nurse told him that Urquidi was returning to work. McInnes, appearing upset, walked out of the nurse's office but called her on the telephone and stated that Urquidi had to have a physical and drug test before he could return to work. Urquidi does not explain and we are unable to perceive how McInnes' insistence that non-discriminatory company procedures be followed is an indication of an impermissible negative attitude.

### Failure to Adhere to Policy

■ Urquidi further alleges that Phelps Dodge failed to adhere to its own policy because he was not permitted to return to

work despite passing all physical examinations. In support of this argument, Urquidi points only to his own testimony that he "passed" all of the tests. As we detailed in the factual summary above, the results of many of the examinations were not in Urquidi's favor and he admitted as much at trial. Even considering this evidence in the light most favorable to Urquidi, his subjective beliefs that he "passed" the tests are no more than conclusions and are inadequate to raise a fact issue precluding a directed verdict. *See Continental Coffee,* 937 S.W.2d at 452 (employee's "impression" that supervisor wanted her back at work instead of at home receiving workers' compensation is a subjective belief which is not probative of a negative attitude); *Texas Division–Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 314 (Tex.1994)(holding that an employee's subjective beliefs are conclusions and do not raise a fact issue precluding summary judgment in a retaliatory discharge action).

### Falsity of the Reason for Discharge

■ Urquidi relies on the conflict between the opinions of Dr. Monsivais and Dr. Becker regarding his ability to return to work as demonstrating that the reason for his discharge was false. We need not address the issue of whether conflicting opinions between doctors may ever be sufficient to establish that the stated reason for discharge is false; were we to so conclude, the evidence does not rise to that level here. While Dr. Monsivais provided Urquidi with a release to return to work, it is undisputed that the release was given at the insistence of Urquidi and against Dr. Monsivais' medical advice. As late as June of 1993, Dr. Monsivais informed the Workers' Compensation Commission that Urquidi would never be able return to fulltime employment. Dr. Becker's refusal to allow Urquidi to return to work was based on the functional capacity assessment which showed that Urquidi could not perform the critical demands of the job. This evidence does not tend to show that Dr. Becker's refusal to release Urquidi was false.

### Differing Treatment Before and After Filing of Workers' Compensation Claim

■ Urquidi also suggests that evidence of discrimination is found in the different manner in which the company treated him before and after he filed the workers' compensation claim in May of 1989. Following the laceration of his finger in 1988, Urquidi was permitted to work in a light duty job for several weeks while he recovered. When he attempted to return to work in 1990, he was informed there were no light duty jobs available. Urquidi presented no evidence that a light duty job existed or was available at any time after May of 1989. In the absence of any policy or practice to the contrary, the company's refusal to create a light duty job for Urquidi does not give rise to an inference of discrimination or retaliation. Further, both decisions were made pursuant to the company's light duty policy which permits a person to return to work if their recuperation is expected to take less than thirty work shifts. Urquidi was given a light duty job in 1988 because it was believed that he would recuperate from the lacerated finger in a short period of time, whereas it was apparent that his recuperation from carpal tunnel syndrome would require substantially longer. Because there is no evidence of discriminatory application or impact on workers' compensation claimants in general or on Urquidi in particular, we cannot infer a negative attitude or discrimination in violation of Section 451.001 from the existence of this otherwise lawful employment policy. *See Continental Coffee,* 937 S.W.2d at 451.

Simply stated, there is no direct or circumstantial evidence raising a fact issue regarding whether, but for Urquidi's filing of a workers' compensation claim, Phelps Dodge would not have terminated him when it did. Therefore, the trial court did not err in granting the directed verdict. Points of Error Nos. One, Two, and Three are overruled; the judgment of the trial court is affirmed.