Opinion issued October 31, 2002






 




In The

Court of Appeals

For The

First District of Texas






NO. 01-00-00589-CV






HARRY GLASS, III, Appellant


V.


AMBER, INC., Appellee






On Appeal from the 215th District Court

Harris County, Texas

Trial Court Cause No. 98-35367






OPINION ON MOTION FOR REHEARING


 We deny appellee's motion for rehearing, but withdraw our opinion and
judgment dated August 9, 2001, and substitute this opinion in its stead.

 Appellant, Harry Glass, III ("Glass"), sued appellee, Amber, Inc. ("Amber"),
for workers' compensation retaliation. The jury found Glass was fired "because he
filed a workers' compensation claim in good faith," and awarded $63,000.00 in
compensatory damages. (1) The jury also found Amber acted "willfully or maliciously"
in discharging Glass, and awarded $300,000.00 in punitive damages. The trial court
granted Amber's motion for judgment notwithstanding the verdict. Glass appeals. 
We affirm in part, and we reverse in part.

Factual and Procedural Background

Glass worked at Amber as a journeyman electrician for more than eight years,
almost exclusively at the Rohm & Haas jobsite. In 1997, Glass sustained several
injuries, and testified that:


 In May 1997, Glass's feet began hurting from walking on large,
uncrushed rocks at the job site. He told Gary Erskine, his supervisor,
and then bought new boots and kept working;

 In September 1997, Glass's back was injured as he unloaded a 10-foot
long, 200 pound solid steel bar from a truck. Glass informed the
foreman of his injury, but an injury report was not filled out; 

 In October 1997, a co-worker slapped Glass hard on the back. The co-worker was 6' 3", 275 pounds, and nicknamed "Lurch." The slap jerked
Glass forward, causing vibrations in his back. A few days later, Glass
began having numbness in his right arm, but he kept working. Glass
testified that he needed his job, and kept working in spite of his injuries
because of Amber's cash safety incentive program and because he
thought he would get better; and 




 On Friday, November 7, 1997, while he was squatting on the ground and
cleaning insulators, Glass injured his knees, which began to swell. 



On the afternoon of November 7, 1997, Glass was informed by Mike Liggett,
the general foreman, that he would be transferred to a new jobsite at Lyondell-Citgo
beginning Monday, November 10th. Glass requested a reduction in force lay-off so
that he would not have to be transferred, but the request was denied.

Over the weekend on November 8th and 9th, Glass's feet and back were
hurting and his arm was numb. On Monday, November 10, 1997, Glass testified he
called Amber's main office and told Donna Jensen he would not be coming in to
work because of his injuries and asked her to inform his new supervisor at the
Lyondell-Citgo job site about his absence. Glass testified he did not know or could
not remember who his new supervisor was going to be. Ms. Jensen denies that this
conversation took place, although she concedes she could not remember every phone
call she received two and a half years ago. 

Glass also called Sharon Yarbrough in Human Resources on November 10th. 
Ms. Yarbrough is in charge of payroll checks, personnel files, and workers'
compensation claims. Glass told Ms. Yarbrough about his various injuries, informed
her he had been hurt on the job, and asked to speak to the Vice President of the
company, Weldon Yarbrough, or to Amber's safety director, Larry Gibson. Ms.
Yarbrough said they were not there, but promised to discuss the matter with them. 
Ms. Yarbrough testified that Glass told her he had been slapped by an employee at
the job site. However, Ms. Yarbrough emphasized at trial that Glass had never used
the words "on-the-job injury." She testified that Amber never received "official
notice" that there had been an on-the-job injury until December 2nd. 

On November 11th, Glass visited the doctor. He also called the Workers'
Compensation Commission. On November 12th, Glass filled out two notices of
injury / claims for compensation at the workers' compensation office for the slap on
the back and the injury to his knees. 

On November 13th, Glass went to Amber's main office to pick up his
paycheck. He spoke with Ms. Yarbrough and told her he had seen a doctor because
he was in a lot of pain. He also told her that he had filed workers' compensation
claims and would be out for a while, but did not want to quit. Glass testified that Ms.
Yarbrough told him that she had discussed his injuries with the CEO and safety
director and informed Glass he could not take time off because Amber had concluded
the injuries were not work-related. Glass told Ms. Yarbrough that he disagreed with
this assessment of his injuries. Ms. Yarbrough testified that Glass told her to cash in
40 hours vacation for that week while he recovered. 

On November 13th and 14th, after Ms. Yarbrough told Glass his injuries were
not work-related, the safety coordinator, Larry Gibson, conducted an investigation as
to whether or not Glass suffered an on-the-job injury. Ultimately, Gibson concluded
the claim could not be substantiated and was not an on-the-job injury. He got
statements from several employees, but did not interview Glass to find out his version
of the events. The employee statements indicated that, although no one saw Glass
being slapped that day, he had been slapped in the past. 

Glass came into the Amber office on November 20th to pick up his vacation
pay check and told Ms. Yarbrough he did not want to quit, but was not sure when he
could come back to work because of his injuries. Glass had a follow-up doctor visit
on November 22nd.

Glass faxed copies of his two workers' compensation claims to the Amber main
office on December 2nd. On December 8th and 9th, he filed two more workers'
compensation claims for the foot and back injuries. On December 11th, he received
letters denying all of his workers' compensation claims. The letters stated that no
injury had been reported and that there had been no injury within the course and
scope of Glass's employment at Amber. 

On December 12, Glass received a final paycheck. That day, Glass wrote a
letter to the CEO, Mr. Shrum, indicating that he did not want to quit and that he had
on-the-job injuries, which prevented him from returning to work and performing his
regular tasks. Glass testified that he wrote the letter to Mr. Shrum because he
"thought that they didn't understand or didn't know what was going on." He
testified, "I thought that maybe other employees were trying to hide the fact that I had
reported injuries and so I was trying to find out if they would accept my claims." 

In a letter dated December 15th, from Mr. Shrum, typed by Ms. Yarbrough, 
Amber informed Glass he was "assumed quit" [sic] as of December 1, because they
had not "heard from [him] in two weeks." Glass's last evaluation was also enclosed. 
It was dated December 1st, and listed his job performance and attendance as
satisfactory and his attitude as poor. The form was filled out by Ms. Yarbrough. 
Glass presented evidence that he had received good to excellent evaluations in the
past. (2) Close examination of Glass's personnel record shows some evidence of
alteration. Near the words "assumed quit," it appears as though the date "12/16/97"
has been erased and replaced with "12/1/97." Glass contends the December 15 letter
was written in response to his December 12th letter. 

Glass wrote another letter to Amber on December 17th and sent it by certified
mail. The letter explained that Glass had not quit, and that he had been keeping the
company updated regarding his situation, both in person and via the telephone. It
stated, "you certainly have heard from me on multiple occasions . . . I have not quit
and am not quitting now. However, since you regard my employment as terminated,
it appears I have been fired." 

On appeal, Amber contends Glass was fired on December 1st because he failed
to report to work and failed to contact his supervisor regarding his absences in a
manner consistent with their absence policy. (3) Glass has been diagnosed with cervical
spondylosis. 

Glass sued Amber for discharging him in retaliation for having made a
compensation claim, as prohibited by Texas Labor Code section 451.001. (4) Glass
presented evidence and testimony that he was fired for filing workers' compensation
claims for these injuries. At trial, Amber's motion for a directed verdict was denied. 
The jury rendered a verdict favorable to Glass on his workers' compensation
retaliation claims, and then the trial court granted a judgment notwithstanding the
verdict ("JNOV").

In his first issue on appeal, Glass contends that the trial court erred in granting
a judgment notwithstanding the verdict because there was legally and factually
sufficient evidence to support the jury's findings. In his second issue, Glass urges
that the trial court erred because it did not apply the correct legal standard when it
failed to consider all evidence in the light most favorable to the jury finding. He asks
this Court to reverse and render judgment granting him all damages awarded by the
jury. Amber contends the JNOV was proper because Glass failed to establish a causal
connection between the filing of the workers' compensation claims and his discharge. 
See Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450-51 (Tex. 1996)
(requiring either direct or circumstantial evidence to establish a link between
termination and the filing of the compensation claim). 

Analysis

A. Standard of Review

 A trial court may grant a JNOV if there is no evidence to support the jury
finding on the issue of liability. Brown v. Bank of Galveston, 963 S.W.2d 511, 513
(Tex. 1998). In determining whether or not to uphold the JNOV, we consider the
evidence in the light most favorable to the verdict and all reasonable inferences that
tend to support it. Id.; see Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex.
1990). We consider only the evidence and inferences supporting the jury's answers. 
See Navarette v. Temple Indep. Sch. Dist., 706 S.W.2d 308, 309 (Tex. 1986). If there
is more than a scintilla of evidence to support the jury's finding, then the JNOV will
be reversed. Id.

B. Viewing the evidence in the light most favorable to the verdict, was there more
than a scintilla of evidence presented to support the jury finding an illegal
termination?

 We find there was more than a scintilla of evidence to support the jury finding
that Glass was discharged because he filed a workers' compensation claim in good
faith. The evidence shows that Glass called on the first day he was going to be
absent, and then kept in touch with the company, as evidenced by the November 13th
and November 20th in-person visits, as well as letters. Furthermore, after good
evaluations for eight years, on the date of firing Glass received a poor evaluation,
filled out by the same person with whom he had been discussing his workers'
compensation claim. In addition, Amber employees testified they had not been
officially notified of the filed workers' compensation claims until December 2nd. 
Amber's timing seems too coincidental when it "fired" Glass the day before, on
December 1st, but the termination letter was dated two weeks later. The jury could
have believed this was timed to avoid a retaliation action because the letter itself was
dated December 15th, suggesting Amber backdated the termination. 

 Amber contends it never received official notice of Glass's workers'
compensation claims until December 2nd, and fired Glass the day before. Even so,
it conducted an investigation as early as November 13th, and the jury could have
chosen to disbelieve Mr. Gibson and believe instead that the company was aware the
workers' compensation claim had been filed on November 13th. Or the jury could
have believed, with only nine people working in the office, someone would have
heard or seen Glass talk to Ms. Yarbrough. Wrongful discharge is a viable cause of
action when an employee is fired once he or she has begun taking steps towards
instituting a proceeding for collecting workers' compensation benefits. See Worsham
Steel Co. v. Arias, 831 S.W.2d 81, 84 (Tex. App.-El Paso 1992, no writ). Instituting
a proceeding begins once an employee informs his employer of his on-the-job injury. 
See id. (citing Hunt v. Van Der Horst Corp., 711 S.W.2d 77, 80 (Tex. App.-Dallas
1986, no writ)). 

 Thus, it would have been reasonable for a jury to infer that the letter of
termination, which said Glass was being fired because "no one had heard from him
in two weeks," was pretextual because he had begun taking steps to institute a
workers' compensation proceeding. Even though the evidence may be conflicting,
the jury is entitled to believe either story. The jury seemed to believe that Mr. Glass
acted reasonably. As the sole judge of the credibility of witness testimony, the jury
can discount the testimony of any witness. See Skrepnek v. Shearson Lehman Bros.,
Inc., 889 S.W.2d 578, 579 (Tex. App.-Houston [14th Dist.] 1994, no writ). Because
there is more than a scintilla of evidence to support the jury's verdict, we sustain
Glass's first issue. 

 Amber contends the evidence is legally insufficient to establish workers'
compensation retaliation, arguing that Glass has not provided evidence of a causal
connection between the termination and the filing of a workers compensation claim. 
See Continental Coffee, 937 S.W.2d at 450-51 (quoting without disapproval from
Continental Coffee Products Co. v. Cazarez, 903 S.W.2d 70, 77-78 (Tex.
App.--Houston [14th Dist.] 1995), aff'd in part and rev'd in part, 937 S.W.2d 444
(Tex. 1996)). A plaintiff does not have to prove that the termination was "solely
because" of a workers' compensation claim. Id. at 450. The causal connection can
be established through circumstantial evidence and the reasonable inferences
stemming from such evidence. Id. at 451. 

 Examples of circumstantial evidence that can help establish a causal connection
between termination and the filing a compensation claim include: (1) knowledge of
the compensation claim by those making the termination decision; (2) a negative
attitude expressed toward the employee's injured condition; (3) failure to follow
established company policies; (4) discriminatory treatment in comparison to similarly
situated employees; or (5) evidence that the stated reason for discharge was false. See
id. at 451; see also Palmer v. Miller Brewing Co., 852 S.W.2d 57, 61 (Tex.
App.--Fort Worth 1993, writ denied); Paragon Hotel Corp. v. Ramirez, 783 S.W.2d
654, 658 (Tex. App.--El Paso 1989, writ denied). 

 The five Continental Coffee factors are not elements of the cause of action, nor
are they an exhaustive list of the types of circumstantial evidence that could establish
a causal connection. See Dallas Area Rapid Transit v. Johnson, 50 S.W.3d 738, 741
(Tex. App.--Dallas 2001, no pet.). The first factor, knowledge of the compensation
claim by those making the termination decision, places the terminated employee into
the statute's protected class but is not sufficient, standing alone, to show a violation. 
Urquidi v. Phelps Dodge Ref. Corp., 973 S.W.2d 400, 404 (Tex. App.--El Paso
1998, no pet.). With this in mind, we will examine the Continental Coffee factors in
turn.

 1. Knowledge of the compensation claim by those making the termination
decision

 First, there was evidence to suggest the company knew of the workers'
compensation claim before the decision to terminate was made. If we view the
evidence in the light most favorable to the verdict, Glass informed Ms. Yarbrough he
was injured and would need time off on November 10th. Glass faxed copies of the
claims to Amber on December 2nd. No particular form or manner of notice of a
workers' compensation claim is required. See U.S. Fire Ins. Co. v. Ramos, 863
S.W.2d 534, 538 (Tex. App.-El Paso 1993, writ denied) (finding an employer had
actual notice when a worker told his supervisor months earlier that he was having
problems breathing and then told his supervisor he had seen a lung specialist). 

 2. A negative attitude expressed toward the employee's injured condition

 There is some evidence of a negative attitude towards Glass after the claims
were filed. Glass was given a poor evaluation after filing the claims. Sudden changes
in employee evaluations have been considered circumstantial evidence of retaliation. 
Castor v. Laredo Cmty. Coll., 963 S.W.2d 783, 785 (Tex. App.-San Antonio 1998,
no pet.). In addition, when Mr. Gibson conducted the investigation, he never spoke
to Glass. Amber cites Urquidi v. Phelps Dodge Ref. Corp., 973 S.W.2d at 404, to
establish that there was no evidence of retaliation. We do not disagree with Urquidi;
however, we find Amber's reliance on the case improper. Urquidi stands for the
proposition that an employee's subjective beliefs are not probative of a negative
attitude towards injured employees. See id. at 405. In the case before us, Glass's
evidence rises above the level of his own subjective belief, as evidenced by his
suddenly poor evaluations.

 3. Failure to follow established company policies

 The absence policy at Amber required employees who were going to miss work
to notify their supervisor before their shift started. A copy of the policy was not
given to the employees. (5) The only number listed on the policy to call for absences
was the number for the Rohm & Haas worksite, but Amber contends that Glass
should have notified Lyondell-Citgo of his absences. Glass testified he was
scheduled to be transferred from the Rohm & Haas worksite for the first time in many
years and he did not remember who his new supervisor was going to be at the
Lyondell-Citgo site. (6) 

 Amber did not uniformly apply its absence policy. The written policy says the
employee is to call a supervisor on the first day he will be out. But testimony
indicates that there are a variety of interpretations of this policy. Ms. Yarbrough
testified that an employee must call in every day. Eddy Cox testified that an
employee could either call the front office or his supervisor, and Donna Jensen's
testimony confirms this. Ms. Jensen testified workers have called her in the past and
she passes such messages on to the supervisor. Mike Liggett testified that the policy
was just to call in and let someone at the company know. 

 Indeed, Glass has followed this policy himself in the past without problems. 
Glass testified that, in the past, when he needed to have surgery or was going to be
out, he would call the secretary in the office, and the secretary would relay the
message to the supervisor without any problem. It was difficult to get in touch with
the supervisors because they were often out in the field. Glass's supervisor testified
that if an employee had discussed an absence prior to taking leave, one call would be
sufficient, but anything that was not arranged in advance had to be phoned in daily. 

 4. Discriminatory treatment in comparison to a similarly situated employee.

 Glass presented no evidence of discriminatory treatment as compared to a 
similarly-situated employee. He tried to show that the Amber was more
accommodating to a supervisor who suffered from cancer. A cancer patient, however,
is not a similarly-situated employee because cancer does not result from an on-the-job
injury requiring a workers' compensation claim. Nevertheless, we believe that Glass
did present enough evidence to establish the necessary causal link between the
termination and the filing of the claim. 

 5. Evidence that the stated reason for discharge was false.

 There is also some evidence that suggests the reason for discharge was false. 
Ms. Yarbrough admits Glass spoke with her, came in to get paychecks, and told her
about his injuries. Despite that, the reason given for termination was that no one had
heard from Glass. The timing of the letter was suspicious, given that it was written
two weeks after the "official notice" of the claims, but may have been back-dated to
a day before the official notice. 

 6. Incentive to refrain from reporting on-the-job injuries

 In addition to the laundry list of Continental Coffee factors, at least one
appellate court has held that a company's incentive program designed to encourage
employees to refrain from reporting on-the-job injuries may be some circumstantial
evidence to support a finding of unlawful termination for filing a workers'
compensation claim. Urquidi, 973 S.W.2d at 404. Amber had a safety incentive
program, whereby cash was distributed to those workers who had reported no
injuries. (7) Amber fails to address this point in its brief. 

 Based on the record before us, the evidence is legally sufficient to support a
discriminatory reason for Glass's termination. Although some of the evidence may
be conflicting, this Court is not a fact finder, and we will not substitute our judgment
for the jury's, even if the evidence could have supported another result. See Clancy
v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ ref'd n.r.e.). After
considering the evidence in the light most favorable to the jury verdict and making
all reasonable inferences that tend to support it, we find there is more than a scintilla
of evidence to support the jury verdict with regard to the compensatory damages
awarded.

C. Punitive Damages

 The jury found that Amber acted "willfully or maliciously" in discharging
Glass and awarded $300,000 to Glass in punitive damages. (8) Section 451.002 allows
an employee to recover "reasonable damages incurred" as a result of the retaliatory
firing. Tex. Lab. Code Ann. §451.002 (Vernon 1996). The supreme court has held
that these reasonable damages can include punitive damages. Continental Coffee,
937 S.W.2d at 452; Azar Nut Co. v. Caille, 734 S.W.2d 667, 668 (Tex. 1987). 

 To recover punitive damages for a violation of section 451.001, a plaintiff must
prove the employer acted willfully and with actual malice. Continental Coffee, 937
S.W.2d at 454. Actual malice is characterized by ill-will, spite, evil motive, or
purposing the injuring of another. Id. at 452. Actual malice must be directed towards
the individual employee. See C&D Robotics, Inc. v. Mann, 47 S.W.3d 194, 202 (Tex.
App.--Texarkana 2001, no pet.) (holding that evidence of malice was insufficient
because it did not show personal animosity or desire to injure).

 Punitive damages are not appropriate for every violation of the statute. 
Continental Coffee, 937 S.W.2d at 453. An act will not be deemed malicious, and
thus warrant punitive damages, merely because it is unlawful or wrongful. Id. at 454
(quoting Jones v. Ross, 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943)). Requiring
evidence of ill-will, spite, or a specific intent to cause injury to the employee ensures
that only egregious violations of the statute will be subject to punitive awards. Id. at
454. 

 Glass argues that actual malice was shown based on the following evidence: 
(1) Amber did not consult with Glass during its investigation of his injuries; (2)
Amber refused to fill out an injury report or workers' compensation form for Glass;
(3) Amber denied to its insurance carrier that Glass had been injured; (4) Amber
denied Glass a requested medical leave; (5) Amber told Glass it thought his injuries
were not work related; (6) no one from the company ever visited Glass; (7) Amber
disregarded his notifications that he was not quitting; (8) Amber's owner said he
believed Glass was lying about his injuries; (9) Glass was fired just before safety
bonuses were to be distributed; (10) Glass was not informed of the company disability
plan; (11) Amber altered the date on its termination letter; and (12) Glass had
received positive employee evaluations for eight and a half years before his
termination.

 Glass notes that his case is distinguishable from Continental Coffee. There, 
the supreme court found no evidence of actual malice, noting that the person who
fired the employee had never even met her. 937 S.W.2d at 454. While evidence was
presented suggesting that Glass was fired by someone who had met Glass previously,
that is not enough to show malice. Cf. C&D Robotics, 47 S.W.3d at 197, 201
(holding evidence of malice insufficient in case with personal contact between
employee and management). The factors cited by Glass are consistent with Amber
not believing Glass's injury claims and seeking to create a pretext justification for the
illegal firing. A showing of this sort helps to demonstrate the causal connection
necessary to recover actual damages under the statute. The cited evidence suggests
Amber had a negative attitude towards Glass's injured condition and that the stated
reason for the discharge was false. See Continental Coffee, 937 S.W.2d at 451
(quoting examples of sufficient circumstantial evidence noted by court of appeals). 
However, under the facts of this case, this set of evidence is not a sufficient basis
from which a jury could conclude that Amber acted with actual malice.

 In Continental Coffee, the supreme court re-emphasized the point that punitive
damages are legally proper in only the "most exceptional cases." Continental Coffee,
937 S.W.2d at 454 (quoting Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex.
1994)). Firing an employee for filing a workers compensation claim in good faith is
always an unseemly act. Often such actions are motivated by greed. However,
demonstrating a self-serving economic motive for the firing is not sufficient to
support a claim of malice. See Whole Foods Mkt. Southwest v. Tijerina, 979 S.W.2d
768 (Tex. App.- Houston [14th Dist.] 1998, pet. denied). Actions motivated by greed
focus on an employer's own financial well-being and usually disregard the rights of
employees out of selfishness, but an act done with actual malice includes a conscious
desire to harm the employee--sometimes even at the expense of the employer's own
financial interests. 

 Short of an employer confessing a deep hatred for the employee and expressing
delight at the sufferings brought on by the employee's discharge, it is very difficult
to state generally what evidence could demonstrate actual malice. Yet, because (1)
an unlawful firing does not automatically trigger punitive damages, Continental
Coffee, 937 S.W.2d at 453-54, and (2) a negative attitude towards an employee's
injury can help show the causal connection element, id. at 451, it follows that the
mere presence of a negative attitude towards an employee's injury does not
automatically make punitive damages proper. At some point, however, a negative
attitude towards an employee's injury may become actual malice towards the
employee. The question for us is whether there was a scintilla of evidence to support
the jury's conclusion that the facts of this case crossed that line and constituted a
retaliatory firing made with actual malice. 

 Despite its diminutive name, scintilla is not a legal term without some weight. 
For more than a scintilla to exist, the evidence must rise to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Merrell Dow
Pharm. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of
evidence exists when the evidence is so weak as to do no more than create a surmise
or suspicion of a fact. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). 
While the evidence that Glass highlights could conceivably be consistent with one
acting out of malice, this circumstantial evidence is not substantial enough that a jury
could reasonably infer malice from it alone. No more than a suspicion of malice can
be inferred from this evidence. The evidence is far more consistent with economic
self-interest and a desire to avoid detection rather than ill-will or spite directed at 
Glass personally. Thus, while we see more than a scintilla of evidence supporting the
jury's finding a retaliatory firing, we do not see a scintilla of evidence suggesting that
this action was taken with actual malice.

 We sustain appellant's first issue as to compensatory damages and overrule it
as to punitive damages.



D. Appellant's Second Issue

 Glass contends the trial judge erred in granting a JNOV because he relied, (9) in
part on the following testimony: 

 AMBER'S ATTORNEY: Okay. Which of these workers'
compensation claims are you claiming was the basis for Amber's firing
you? Was it the slap on the back that you supposedly incurred in
October of 97, your twisted knee in November of 97, your broken feet
in May of 97, your back in September of 97 or the exposure to toxic
chemicals throughout the course of your employment with Amber?


 GLASS: I'm not sure.


 AMBER'S ATTORNEY: You don't know?


 GLASS: No.


In light of our previous holding that the JNOV was improper, it is not necessary for
us to address this issue. However, we feel it is worth noting that, under the Texas
Labor Code, it is illegal to fire someone for filing a workers' compensation claim in
good faith. Tex. Lab. Code Ann. §451.001. It is irrelevant if the claim filed is
meritorious. In addition, if more than one claim is filed and the worker is terminated
in violation of the statute, the Texas Labor Code does not require an injured worker
to identify which claim the company relied upon in the illegal termination. As a lay
person, the injured worker may not be able answer technically which claim was the
basis of his termination, and this should not be held against him.

Conclusion

 We reverse the trial court's grant of the JNOV as to compensatory damages,
and we remand for entry of judgment on appellant's compensatory damage jury
award. In all other respects, we affirm the judgment of the trial court. 



 Adele Hedges

 Justice


Panel consists of Justices Hedges and Nuchia. (10)

Do not publish. Tex. R. App. P. 47.
1. The total amount of damages were for lost wages, employment benefits, mental
anguish and medical expenses. Glass testified that: (1) he incurred $500 in out
of pocket medical expenses; (2) he earned approximately $32,000 a year; (3)
he suffered mental anguish; and (4) that he tried to mitigate his damages by
applying for electrical drafting positions and going back to school at night. 
2. Previously, out of 12 evaluations, he received 10 "excellents" and two "goods"
for attendance record, and 12 out of 12 "goods" for performance level. He did
well at the company and enjoyed working there so much that he even named
his daughter Amber. 
3. However, the termination letter only said the termination was because "no one
had heard" from him.
4. Section 451.001 states: "A person may not discharge or in any manner
discriminate against an employee because the employee has . . . filed a
workers' compensation claim in good faith . . . ." Tex. Lab. Code Ann.
§451.001 (Vernon 1996). A person who violates section 451.001 is liable for
"reasonable damages incurred" by the employee. Tex. Lab. Code Ann.
§451.002 (Vernon 1996). The burden of proof remains on the employee. See
id. 
5. However, a copy of the policy was posted on a big board in front of the
compound.
6. However, there was testimony suggesting that the supervisors' names on the
various jobsites were common knowledge, and that Glass knew who his next
boss would be.
7. We note that not all safety incentive programs that encourage workers to
follow safety directions should be considered evidence of a causal link
between termination and the filing of a compensation claim. We merely
recognize that a program that provides rewards for refraining from reporting
on-the-job injuries may be some evidence that could be used to support a
workers' compensation retaliation action.
8. The charge submitted to the jury was in conflict with the supreme court's
holding in Continental Coffee requiring a finding of "actual malice" before
punitive damages can be assessed against an employer for violating section
451.001. Continental Coffee, 937 S.W.2d at 454. In addition to allowing the
jury to answer "yes" if Amber merely acted "willfully," the charge also defined
a malicious act as "an intentional wrongful act done without cause or excuse
before one believes it to be right or legal or done with conscious disregard for
the rights of others." This definition is similar to the definition of implied or
legal malice given in Continental Coffee. Id. ("Implied or legal malice . . .
exists when wrongful conduct is intentional and without just cause or
excuse."). The supreme court rejected the implied or legal malice standard and
instead required actual malice. Id. at 452. Amber properly objected to the
charge, arguing that actual malice must be shown.



 Glass argues that evidence supported the jury's award of punitive damages
under the standard set forth in Continental Coffee. Specifically, Glass argues
that "[i]ll-will, spite, or a specific intent to cause injury to the employee was
shown by the evidence." Because Glass, the appellant and beneficiary of the
lower malice standard at trial, has now raised the proper Continental Coffee
standard on appeal, we will review the evidence under that standard. Cf. Cox
& Smith, Inc. v. Cook, 974 S.W.2d 217, 225 (Tex. App.--San Antonio 1998,
pet. denied) (noting it is "illogical to bind a party disadvantaged by an
improper jury charge submitted over proper objection to the same improper
jury charge on an appeal which challenges the sufficiency of the evidence"). 
This approach best serves the interests of justice and judicial efficiency in the
present case. 

 
9. The final judgment says "The court hereby disregards the jury verdict. One
factor the Court considered in this regard was Mr. Glass's testimony . . . that
he did not know which of his several compensation claims was the basis of his
termination. Additionally, the Court is persuaded that Glass did not satisfy the
standard set out by the Texas Supreme Court in Continental Coffee. Therefore,
the Court orders that plaintiff, Harry Glass, III, take nothing by his suit." 
10. This case was originally submitted to a panel consisting of Chief Justice
Michael H. Schneider and Justices Hedges and Nuchia. However, pursuant to
his appointment to the Texas Supreme Court, Chief Justice Schneider resigned
his position on this Court, effective September 6, 2002, and did not participate
in this opinion on rehearing.